**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**DALTON GUILLOT,**
**DESTINY GUILLOT,**
**EMMA MAUER on behalf of minor child**          **CIVIL ACTION NO. 20-1604**
**E.M.,**
**LINDSEY MARGIOTTA on behalf of**
**minor children L.G. and R.G.**                **JUDGE: _____**

**Plaintiffs**
                                                **MAG: _____**

**JEFFERSON PARISH SHERIFF**
**JOSEPH P. LOPINTO, III,**
**CORRECT HEALTH JEFFERSON,**
**LLC,**
**IRONSHORE SPECIALTY**
**INSURANCE CO.**

**Defendants**

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*\*\*\*\*\*

**COMPLAINT**

**NATURE OF THE ACTION**

This action arises under the United States Constitution.  Specifically, the action arises under

Fourth Amendment and the Due Process Clause of the Fourteenth Amendment, and is brought

pursuant to 42 U.S.C. §§1983 et seq. and 1988, which establish a federal court remedy for

constitutional violations.  The action also arises under the Louisiana State Constitution, specifically

Articles I §§2 and 5.  The action is also brought under the general tort principles set forth in the

Louisiana Civil Code, including, without limitation, Articles 2315 and 2320 and common law tort

principles adopted by Louisiana courts.  Plaintiffs are not proceeding under the Louisiana Medical

Malpractice Act.

Marshall Guillot hanged himself in a private cell in the Jefferson Parish jail on June 5, 2019,

by tying a bed sheet to a window grate.  Defendants failed to properly assess him as a suicide risk,

or even as a potential risk, in spite of the fact that he presented at the jail informing them of prior

hospitalization for psychiatric needs, and a diagnosis of anxiety, major depression, and Post Traumatic Stress Disorder (PTSD).  The defendant Lopinto had actual knowledge of Mr. Guillot's contemplation of suicide, as he communicated to his mother in a recorded phone call from the jail that he was considering harming himself if he was not released.

The defendants exhibited a wanton and reckless disregard for Mr. Guillot's safety by placing him in a private cell without a cell mate, and doing nothing to prevent his suicide.  The defendants knew of the risk, and the ability of inmates to take their lives by hanging in these private cells, and still chose to place Marshall Guillot there, in spite of his well-documented psychiatric history, which is reflected on his intake paperwork from the jail.

Three other inmates, namely Jerome Bell, Joshua Belcher, and Jatory Evans, took their lives in a two month period in 2017 in the same manner, by tying a bed sheet to the window grate in one of the private cells.  The defendant Lopinto was aware of the consistent use of the window grate by inmates to commit suicide, and the fact that the wing of the jail with private cells was not easily visible by guards, thus creating a suicide risk.  After the third suicide in September of 2017, defendant Lopinto instituted a review of the policies at the Jefferson Parish Correctional Center ("JPCC").  The evaluation concluded that the window grates presented a suicide risk, and should be replaced.  Yet defendant Lopinto failed to replace all of the grates, and continued to house inmates with mental afflictions in these private cells, thus exhibiting a reckless disregard and intentional, deliberate indifference to the mental health and medical health needs of these inmates.

## STATEMENT OF JURISDICTION

1.

Jurisdiction is conferred upon this court by the provisions of 28 U.S.C. 1343(3), the jurisdictional counterpart of 42 U.S.C. 1983, and 28 U.S.C. 1331.  Supplemental jurisdiction is

conferred upon this court over the state law claims pursuant to 28 U.S.C. 1367(a).  Venue is proper

pursuant to 28 U.S.C. § 1391(b), as Jefferson Parish was the District in which the events giving rise

to the claim transpired.

**PARTIES**

**2.**

Plaintiffs are:

> **DALTON GUILLOT**, An individual person of the age of majority and domiciled in the
> state of Louisiana, Parish of Jefferson, and the son of the late Marshall Guillot;
> **DESTINY GUILLOT**, An individual person of the age of majority and domiciled in the
> state of Louisiana, Parish of Jefferson, and the daughter of the late Marshall Guillot;
> **EMMA MAUER,** appearing herein on behalf of her minor child **E.M.**, son of the late
> Marshall Guillot, as natural tutor of the minor child, and domiciled in the state of Louisiana,
> Parish of Jefferson;
> **LINDSEY MARGIOTTA**, appearing herein on behalf of her minor children **L.G.**, son of
> the late Marshall Guillot, and **R.G.**, daughter of the late Marshall Guillot, as natural tutor of
> the minor children, and domiciled in the state of Louisiana, Parish of Lafayette.

Defendants are:

> **SHERIFF JOSEPH P. LOPINTO, III,** (hereinafter referred to as "Lopinto") a person
> of full age of majority and a resident of Louisiana.  At all times relevant, Lopinto was the
> duly elected Sheriff of Jefferson Parish.  He is sued in his individual and official
> capacity.*
> **CORRECTHEALTH JEFFERSON, L.L.C.** ("Correcthealth") a Non-Louisiana limited
> liability company with its principle place of business Atlanta, Georgia. At all times
> relevant, Correcthealth Jefferson, L.L.C. was employed by the Jefferson Parish Sheriff to
> provide medical services to inmates at the Jefferson Parish (Gretna) Jail.

**IRONSHORE SPECIALTY INSURANCE COMPANY, INC. (Hereinafter**

**"Ironshore")** a foreign insurance corporation, organized and chartered under the laws of

a state other than Louisiana, but authorized to do and doing business in the State of

Louisiana, as Liability Insurer for Correcthealth, LLC, at all times relevant to this cause

of action.

*Referred to herein is the Jefferson Parish Sheriff's Office- "JPSO" and the Jefferson Parish

Correctional Center- "JPCC."

### FACTS

**3.**

On May 26, 2019, Marshall Guillot was arrested for Unauthorized Entry of an

Inhabited Dwelling, (La. R.S. 14:62.3), Home Invasion, La. R.S. 14:62.8), Intimidating a

witness, (La. R.S. 14:129.1), Domestic Abuse Battery (La. R.S.14:35.3), Theft (14:67-

misdemeanor), and also for three other outstanding warrants for Criminal Neglect of Family,

(misdemeanor-La. R.S. 14:74), Theft (La. R.S. 14:67-Felony), and Disturbing the Peace (La.

14:103-misdemeanor).   His total bail amount on all charges was $120,500.00. When he was

apprehended, he was found hiding in an attic, armed with a combat knife. This was Mr. Guillot's

5th time being arrested and jailed in Jefferson Parish in his lifetime.

**4.**

Guillot maintained verbally and in letters to his mother that he was innocent of the

charges.  He claimed his girlfriend at the time had set him up and accused him of stealing

property and entering her home without consent, when he claimed he was still seeing her on

her own volition.

He was brought to court for a bail hearing on May 31, 2019,and for the mandatory

probable cause hearing pursuant to "Gwen's law" (**La. C.C.P. Article 330.3**) on May 31, 2019.

In addition of the cumulative bail being set at $120,500.00, an 18 month Protective Order was

granted against him, and he was ordered not to possess a firearm.  He, through counsel, objected

to the Commissioner's ruling.  When he returned to the jail, he was very upset and crying.

**4.**

Nicole Wadlington, an employee of defendant, Correcthealth Jefferson, LLC, initially

interviewed Marshall Guillot on May 26, 2019.  On the intake screening form, Wadlington noted

that Marshall Guillot had a prior mental health history including Post-traumatic Stress Disorder,

Major Depression, and Anxiety.

**5.**

Wadlington further noted that Marshall Guillot was prescribed 150 milligrams per day of

Effexor, a drug used to treat depression.  She scheduled an appointment for "MLP Med Review"

for Mr. Guillot, and requested his medical records.  Mr. Guillot was then placed in general

population.

**6.**

Crystal Bradley, another employee of Correct Health Jefferson, LLC, performed a

physical assessment on Marshall Guillot.  On the intake form, she noted in four separate

responses that in regards to Mr. Guillot's mental health, that his attitude, affect/mood,

hallucinations, and homicidal/suicidal assessments were all "within normal limits."  However,

other inmates in the jail at that time confirmed that Mr. Guillot was crying hysterically and

pacing most of the time he was in custody, and that he slept very little.  On May 27, 2019,

Crystal Bradley set an appointment for Mr. Guillot in the jail's internal system, "referring him to

mental health."  This appointment was marked as "high priority," according to the intake form.

**7.**

On May 27, 2019, Mr. Guillot was examined by Juanita Alexander-Sallier, who again noted Mr. Guillot's history of Depression, Post-traumatic Stress Disorder, and Anxiety, and "referred him to mental health," as noted on the intake screening form.  On that day, Crystal Bradley set another appointment described as "refer to mental health," and in the appointment category "Menhlth Sickcall-Prov."  This appointment was also categorized as high priority, but was apparently rescheduled at least one time.  It appears that the appointment was rescheduled, then deleted and rescheduled again, for June 5, 2019.  Each entry where the appointment was in any way modified by any of the Correcthealth employees, it was always marked as "high priority."

**8.**

On June 3, 2019, Mr. Guillot was involved in a physical altercation with another inmate. He was treated by medical staff for minor abrasions.  In spite of multiple employees acknowledging the urgency of the situation,  on June 4, 2017, Interviewer Candace Foussell, employee of the defendant, noted that Mr. Guillot was "medically clear for Iso-Seg NO CONTRAINDICATIONS FOR PLACEMENT IN ISO-SEG."  Mr. Guillot was placed in isolation/segregation that afternoon, and was not monitored by any of the staff at the jail.

**9.**

On June 5, 2019 Mr. Guillot hanged himself from the window grate in his private cell, using a bed sheet. He was discovered at 10:52 p.m. by Sergeant Q. Walker during roll call.  Mr. Guillot passed away at West Jefferson Medical Center on June 6, 2019.

**10.**

While detained, Mr. Guillot made several phone calls to his mother while in the custody

of the defendants.  On one recorded phone call, Mr. Guillot communicated to his mother than he was having suicidal thoughts.  The staff at JPSO had actual knowledge of Mr. Guillot's suicidal ideation, and failed to classify him as an actively suicidal inmate.

**11.**

There were three suicides at the JPCC in August and September of 2017.   Jerome Bell committed suicide on August 4, Josh Belcher on August 17 and Jatory Evans on September 27, 2017.  All three suicides were by hanging. All three involved using a bed sheet affixed to a window grate inside a one person cell. At least two of the decedents had told Defendants they were suicidal. Curiously, all were found by inmates rather than JPSO security personnel. All three were in cells in an area of the prison that were difficult to monitor due to poor sightlines. All three men were on suicide watch while in custody, and were removed from suicide watch by the same employee, David Jennings, a social worker.  He is still employed by the JPSO.

**12.**

On August 4, 2017, Jerome Bell hung himself using a noose made from his bed sheet that was affixed to a window grate inside a one-person cell. The Defendants' investigation described it this way:

"A window, approximately 1 foot x 3 feet, was on the opposite side of the wall of the cell gate and approximately 6 feet above the bed. An iron grate was welded to the interior of the window and hanging from this grate was [sic] 3 foot long noose... The noose appeared to have been fashioned from the strands of bed sheet material which were braided together."  Mr. Bell was placed in a one-person cell despite exhibiting signs that he was a suicide risk.

**13.**

On August 17, 2017, Joshua Belcher hung himself using a sheet affixed to the window

grate of his one-person cell. He was found dead by another inmate. According to Defendants'

investigation, Mr. Belcher's hanging was identical to Mr. Bell's:

"A window, approximately 1 foot x 3 feet, was on the opposite side of the wall of the cell

gate and set to the right. An iron grating was welded to the interior of the window and tied from

this grating was a brown bedsheet with the other end of the sheet torn. The bedsheet was the

standard bedsheet issued to inmates."

## 15.

On September 27, 2017, Jatory Evans hung himself with a bed sheet in his one-person

cell. Like Mr Belcher, JPSO personnel were aware that Mr.Evans was suicidal.  Subsequent to

Mr. Evans' death Defendant Lopinto ordered a review of all jail policies at they relate to suicide

prevention.  The evaluation concluded that the window grates presented a known suicide risk and

that they should be replaced.  Having that information and actual knowledge of the risk, still

defendant Lopinto did not replace all of the grates or otherwise modify them.  Both he, and

employees of Correcthealth continued to allow inmates with known mental health histories to be

housed in these private cells.  Moreover, Mr. Guillot was awaiting a psychiatric evaluation, and

was not given his prescribed depression medication while being housed in a one-person cell.

Also, as per Correcthealth's Suicide Prevention Policy, linens should be removed from cells

where suicidal inmates are being housed.  Both defendants failed to conform to the policy in that

regard.

## 16.

The Defendant Lopinto has a policy of not monitoring prisoners who are an obvious

suicide risk. Furthermore, Defendant Lopinto's staff and Correcthealth's staff  made a choice to

place a prisoner who is clearly a self-proclaimed suicide risk in an area of the prison where it is

difficult for Defendants and their employees to see inside the cells. Hence, the Defendants have implemented a policy of placing prisoners who are a suicide risk in an area of the prison that makes it difficult to prevent prisoners from committing suicide.  Correcthealth failed to identify Marshall Guillot as a suicidal inmate.

**17.**

Defendants do not regularly monitor cells of prisoners who are a suicide risk. Hence, Defendants have a policy of not adequately monitoring prisoners who are a suicide risk. Rather than placing prisoners who are a suicide risk in cells with another prisoner, Defendants have a policy of placing prisoners who are a suicide risk in cells alone.

**18.**

The Sheriff is liable for failing to replace or modify the grates in the cells when the grates were known suicide risk. The Sheriff has a policy of utilizing cells with grates in the window for suicide watch, with the knowledge that the grates are a known suicide risk. Correcthealth knew or should have known that Marshall Guillot was a suicide risk based on his prior diagnosis, his behavior, the phone calls to his mother, and the failure to administer his depression medication. Sheriff Lopinto had actual knowledge of Marshall Guillot's plan to harm himself via the recorded phone call to his mother.  In spite of this knowledge, Mr. Guillot was placed in a private cell that was difficult to monitor and a known suicide risk, presumably because he was involved in a fight with another inmate the day before.  His psychiatric evaluation was pending, and he was awaiting his medication for depression, he should not have been placed in segregation, unmonitored, and unmedicated.

**19.**

On the afternoon of September 28, 2017 the Sheriff instituted an evaluation of the jail

polices and procedures.  The Sheriff initiated the investigation because "all three cases were nearly identical in modus operandi the inmate used a bedsheet or pieces of the fashioned into a length sufficient to tie around the expanded metal covering the [sic] window and then around the neck.

The Sheriff's Office requested that an internal "evaluation of the current expanded metal be conducted to determine if there are any optional products that can be used in place of the expanded metal. The objective is to limit the ability of an inmate to utilize the windows as a tools to harm themselves."

**20.**

The evaluation found that:

"[o]n several of the windows [on the north wings on the fourth floor of the JPCC],  [sic] there is the same expanded metal that was found on the cell windows where inmates harmed themselves. In other cells there was a smaller holed metal that was welded on top of that. We discussed the possibility of having the smaller holed metal welded in place of the expanded metal currently on the majority of the windows. This would also give us the ability to clean out all of the windows and replace the clouded plastic windows. This process would essentially complete three objectives: clean out the windows, allow more light into the cells, and limit the ability of the inmates to utilize the windows as a tool to assist in harming themselves."

**21.**

In spite of this evaluation, and knowing there existed a remedy that could have prevented any further suicides in the same manner (bed sheet tied to the window grate) unbelievably, the Sheriff failed to repair or replace all of the grates that posed a risk.

**22.**

Defendants have exhibited a policy of custom of an inability to properly monitor inmates with known suicidal risks. Defendants have a policy or custom of maintaining a jail with such poor sight lines that it is difficult to monitor inmates on suicide watch, or in segregation. Each of these policies was a contributing factor in Marshall Guillot's death.

**23.**

According to Correcthealth's Suicide Prevention Policy, Correcthealth should have collaborated with the staff at the jail to cross-inform each other of pertinent information as it related to medical and psychiatric care, and housing arrangements.  Both defendants failed to do so.  Correcthealth was aware of Mr. Guillot's  multiple mental health diagnoses.  Both defendants were further aware of the altercation between Mr. Guillot and another inmate on June 3, 2019, as it was documented by both the jail and medical staff.  JPSO staff was aware that Mr. Guillot was despondent, crying and pacing continuously while in general population, and not sleeping.   JPSO failed to share that information with Correcthealth.

**24.**

According to Correcthealth's Suicide Prevention Policy, despair/hopelessness, great concern regarding "what will happen to me," verbalization of a suicide plan, extreme restlessness exhibited by such behavior as continuous pacing, depressed state indicated by crying or insomnia, and concern over events with significant others are all identified as indicators or signs and symptoms of suicidal ideation.  Marshall Guillot displayed all of these signs, in general population with other inmates, on the phone with his mother, and in letters written to his mother. In spite of his behavior clearly indicating a suicide risk, Correcthealth failed to identify Mr.

Guillot as an actively suicidal inmate by violating the terms of their own policy.

**25.**

After the Belcher suicide, Correcthealth employee David Jennings testified under oath at his deposition in August of 2019, that he was provided with recordings and transcripts of recorded phone calls between Belcher and his family revealing information that (admittedly) may have changed his decision to remove Belcher from suicide watch.    However, Marshall Guillot's phone calls to his mother were never reviewed by JPSO or Correcthealth staff, and neither were the letters he wrote home to his mother, even in spite of his obvious need to psychiatric care. Additionally, if a *potentially* suicidal inmate is placed in isolation, constant observation is required.  Correcthealth failed to classify Marshall Guillot as a suicidal or potentially suicidal inmate upon admission, although the records reflect he was.

**26.**

Correcthealth has an established policy of deliberate indifference towards suicidal and potentially suicidal inmates' safety and providing necessary medical care.  In fact, since the string of three suicides in August and September of 2017, Correcthealth has violated it's own Suicide Prevention Policy by continuing to allow a social worker, not a licensed physician or psychiatrist, make medical determinations.  There is only one psychiatrist on staff at the JPCC as of August of 2019, and he visits one day per week.  This is the same policy that was in place in 2017 when Bell, Belcher, and Evans took their lives.  Even after the three back to back suicides in 2017, as of August of 2019, there was still no mental health care personnel staffed at the jail on the weekends. Correcthealth and JPSO cannot possibly abide by their own policy of assessing suicidal inmate and "immediately taking precautions," if there are not mental health professionals

present to perform the necessary steps to that end.  Correcthealth and JPSO have an established

policy of deliberate indifference by not only instituting policies that violate inmates constitutional

rights, but by failing to meet the requirements set forth in their own, self-written Suicide

Prevention Policy.

**27.**

Defendant Correcthealth has a policy of not implementing a policy to monitor prisoners

who are a suicide risk, or a policy of failing to prevent inmates who exhibit signs of suicide risk

from committing suicide.  The normal protocol at JPCC is that the jail is severely understaffed as

it relates to mental health, with one social worker, namely David Jennings, and one psychiatrist,

Dr. Lo, who visits the jail once per week.

**28.**

Defendant Lopinto was aware of Correcthealth's derelict policies and did nothing to

correct them. Despite his knowledge of such defendant Lopinto continues the practice of

delegating medical and mental health care to Correcthealth.  Further, Lopinto failed to adequately

staff the jail with enough mental health providers, thereby denying Marshall Guillot access to

adequate medical care. Marshall Guillot was in the jail for nine (9) days with no psychiatric

treatment and no medication before he took his life.

**29.**

Defendants were aware of the following facts from which an inference of a substantial

risk of harm to Mr. Guillot could be drawn, and plaintiffs submit was, in fact, drawn:

1.      Marshall Guillot was diagnosed and suffered from multiple mental illnesses

        including Major Depression, PTSD, and Anxiety;

2.       Marshall Guillot was prescribed 150 milligrams of Effexor to be taken daily;

3.       Marshall Guillot was crying, pacing, and slept very little while in the Defendant's custody;

4.       Marshall Guillot stated to his mother on a recorded phone call that he was considering harming himself;

5.       Marshall Guillot returned from court on May 31, 2019, having had his bond set at $120,500.00, and having had a Protective Order granted against him by him girlfriend;

6.       Marshall Guillot was despondent and adamant that he was being wrongfully accused, as he stated this to his mother in letters and on the phone;

7.       Marshall Guillot was charged with eight (8) charges, two serious felonies, and had been arrested and charged with crimes on four (4) other occasions over the years in Jefferson Parish, thus adding to his perceived fear of a lengthy jail sentence under the circumstances;

8.       Marshall Guillot got in a fight with another inmate and was moved to isolation/segregation the day before he committed suicide;

9.       Defendants did not administer Mr. Guillot his depression medication while he was in custody;

10.      Defendants failed to offer Mr. Guillot any mental health treatment for the 10 days he was detained prior to his death, and actually rescheduled his original appointment with the mental health professional;

11.      The window grates in Mr. Guillot's cell were a known suicide risk and needed to

be replaced.

## 30.

Inmate Guillot denied alcohol and/or drug use at the intake interview, according to the

defendant's records.  Upon information and belief, plaintiff's family is told that blood samples

were taken, and could be discarded or destroyed after one year after being harvested.  Plaintiff's

pray that the Court issue an order directed unto the defendants not to destroy or discard any

biological samples of any bodily fluid, tissue or other material in their possession.

## 31.

At all times relevant herein, Ironshore Specialty Insurance Company, LLC had a liability

policy in place, insuring the tortious and negligent acts of the Defendant, Correcthealth Jefferson,

LLC.

## <u>CAUSES OF ACTION</u>

## <u>COUNT ONE</u>

**42. U.S.C. § 1983 - Violation of Fourteenth**

**And Eighth Amendment Rights - All Defendants**

Defendant Lopinto, and Correcthealth were grossly negligent, reckless, and deliberately

indifferent in managing, training, and supervising their subordinates, and medical personnel that

interacted with Marshall Guillot. Both defendants recklessly disregarded Mr. Guillot's civil

rights by placing him in solitary confinement/segregation after getting in a fight, in spite of his

obvious need for psychiatric care, as documented in the defendant's records.

## 30.

Defendant Lopinto's failure to supervise (1) Defendant JPCC deputies and medical

personnel and (2) Correcthealth were a material cause of Plaintiff's injuries.

**31.**

Defendant Lopinto and Jefferson Parish Sheriff's Office's failure to oversee the

procedures and conditions at JPCC was a material cause of Plaintiff's injuries.  The injuries

caused by Defendants' conscious and voluntary acts were serious and resulted in lasting damage.

As a result of Defendants' conduct, Plaintiffs suffered, and continue to suffer, physical and

economic damage, as well as emotional and mental pain and suffering.

**32.**

Defendants acted under pretense and color of state law in their individual capacities and

within the scope of their respective employment. Defendant's actions were beyond the scope of

their jurisdiction, authority, and power, and were done willfully, knowingly, and with the specific

intent to deprive Plaintiffs of their constitutional rights secured by 42 U.S.C. § 1983 and Eighth

and Fourteenth Amendment of the United States Constitution.

**33.**

**COUNT TWO**

**International Infliction of Emotional Distress - All Defendants**

Defendants practices, procedures, and policies were a proximate cause of the intentional

infliction of emotional distress.  Defendants supervision of the JPCC personnel and Correcthealth

staff was a proximate cause of the intentional infliction of emotional distress.  Defendants actions

and inaction were intentional and caused emotional distress to Plaintiffs.

**34.**

## COUNT THREE

**42 U.S.C § 1983 - Violation of Fourteenth Amendment Rights -**

**All Defendants for Failure to Provide Adequate Medical Care**

Through the conduct described above, Defendants acting under color of state law, unlawfully deprived Plaintiff, of his right to adequate medical care, which is guaranteed by the Fourteenth Amendment of the United States Constitution.  Based on the string of back to back suicides in 2017, Defendants knew or should have known that the policies and procedures in assessing suicide risks were defective and needed to be change to guard the safety of the inmates. The Defendants knowingly and intentionally limited the inmate's access to reasonable psychiatric and medical care.

**35.**

Defendants, in failing to enact or enforce policies and procedures to ensure that arrestees received adequate medical care, violated Mr. Guillot's Fourteenth Amendment right to adequate medical care.

**36.**

Defendants failed to enact policies and procedures to ensure that the staff of JPCC would adequately respond to medical emergencies and diagnose and treat arrestees.

**37.**

Defendants failed to enact policies and procedures to ensure the proper procedure for placing inmates on suicide watch, including but not limited to: (a) failing to train staff, employees, and/or contractors how to properly diagnose suicide risk; ( b ) failing to hire qualified, credentialed staff, employees, and/or contractors; and or (c) allowing unqualified staff,

employees, and/or contractors to determine who did not did not pose a suicide risk, and (d)

allowing unqualified persons to make medical assessments and medical/psychiatric

determinations.

## 38.

Defendants were aware should have been aware of the environment of mismanagement

and neglect that existed at JPCC and the consequent risk of injury to arrestees that the

environment created.

## 39.

Defendant Lopinto was aware or should have been aware of Marshall Guillot's suicidal

tendencies based on his recorded phone calls to his mother.

## 40.

Despite their actual and constructive knowledge of both the risk present at JPCC and the

three prior suicides in the same type of cells, in the same manner, Defendants exhibited

deliberate indifference toward the medical needs of arrestees.

## 41.

Defendants' deliberate indifference and their failure to enact or enforce policies and

procedures to ensure that arrestees received adequate medical care, caused and/or exacerbated the

injuries.

## 42.

As a result of the constitutionally inadequate medical care at JPCC, Plaintiffs endured,

and will continue to endure, further physical, emotional, and mental pain and suffering.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray that, after due proceedings, judgment be entered in favor of Plaintiffs and against all Defendants, jointly and in solido, and that this Court:

40.-    Award Plaintiffs all compensatory damages reasonable under the circumstances, including but not limited to, physical pain and suffering, mental anguish and emotional distress, medical expenses, loss of enjoyment of life, and any other compensatory damages, for each count alleged in the Complaint;

41.-    Award Plaintiffs punitive damages against all Defendants for each applicable count alleged in this Complaint;

42.-    Award Plaintiffs special damages against all Defendant for each applicable count alleged in this Complaint;

43-    Award Plaintiffs reasonable attorneys' fees, expert fees, and court costs under

42   U.S.C. § 1988 for the prosecution of his 42 U.S.C. § 1983 claims;

44.-    Award Plaintiffs' reasonable attorneys fees' and court costs under state law for the prosecution of his state law claims;

45.-    Award Plaintiffs legal interest on all damages awarded from the date of judicial demand until paid;

46.-    Award Plaintiffs such other and further relief as this Court deems just proper; and

47.-    Award Injunctive and Declaratory Relief against the Defendants' in their official capacities.

48-    For all other equitable relief afforded under these premises.

Respectfully submitted:

**POWELL & ASSOCIATES, LLC**

**s /Tracey T. Powell**
**TRACEY T. POWELL (LABR#29461)**
**204 Village Circle, Suite 3**
**Slidell, LA 70458**
**Tel: (985) 643-1711**
**Fax: (985) 643-1788**
**Email: powellattorney@gmail.com**

**and**

**KIRK P. DORSEY, LLC**
**KIRK P. DORSEY, (#29156)**
**3636 N. Causeway Blvd., Suite 104**
**Metairie, LA 70002**
**Tel: (504) 593-0200**
**Fax: (866) 220-9105**
**Email: kirk@kirkpdorsey.com**