## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**DALTON GUILLOT, at al.**                              **CIVIL ACTION**

**VERSUS**                                             **NO. 20-1604**

**JEFFERSON PARISH SHERIFF**                           **SECTION: "G"(3)**
**JOSEPH P. LOPINTO, III, et al.**

## ORDER AND REASONS

Plaintiffs Dalton Guillot, Destiny Guillot, Evan Mauer, and Lindsey Margiotta on behalf of minor children L.G. and R.G. (collectively, "Plaintiffs") bring this litigation against Defendants Jefferson Parish Sheriff Joseph P. Lopinto, III ("Sheriff Lopinto"), CorrectHealth Jefferson, LLC ("CHJ"), and Ironshore Specialty Insurance Co. ("Ironshore) (collectively, "Defendants") after their father, Marshall Guillot, committed suicide while in custody at the Jefferson Parish Correctional Center.[1] Before the Court is CHJ and Ironshore's (collectively, "Moving Defendants") "Motion to Dismiss."[2] Plaintiffs oppose the motion.[3] Having considered the motion, the memoranda in support and in opposition, the record, and the applicable law, the Court denies the motion.

---

[1] Rec. Doc. 1; Rec. Doc. 41.

[2] Rec. Doc. 46.

[3] Rec. Doc. 47.

1

## I. Background

On June 3, 2020, Plaintiffs filed a complaint in this Court.[4] Plaintiffs named Sheriff Lopinto (the Sheriff of Jefferson Parish), CHJ (a limited liability company that provides medical services to inmates of the Jefferson Parish Correctional Center), and Ironshore (a limited liability company that issued a liability insurance policy to CHJ) as defendants.[5] On July 31, 2020, CHJ filed a motion to dismiss.[6] On August 21, 2020, Ironshore filed a motion to dismiss.[7] On March 31, 2021, the Court denied the motions to dismiss without prejudice.[8] The Court found that Plaintiffs had failed to state claims against CHJ and Ironshore for (i) inadequate medical care in violation of the Fourteenth Amendment and (ii) intentional infliction of emotional distress.[9] The Court granted Plaintiffs leave to amend the complaint to address these deficiencies, if possible.[10] On March 29, 2021, Plaintiffs filed an amended complaint.[11]

In the Amended Complaint, Plaintiffs allege that their father, Marshall Guillot ("Guillot"), was arrested on May 26, 2019, and charged in the 24th Judicial District Court for the Parish of Jefferson with unauthorized entry of an inhabited dwelling, home invasion, intimidating a witness, domestic abuse battery, misdemeanor theft, misdemeanor criminal neglect of family, felony theft,

---

[4] Rec. Doc. 1.

[5] *Id*. at 3–4.

[6] Rec. Doc. 11.

[7] Rec. Doc. 17.

[8] Rec. Doc. 37.

[9] *Id*.

[10] *Id*.

[11] Rec. Doc. 41.

and misdemeanor disturbing the peace.[12] According to the Amended Complaint, Guillot asserted that he was innocent of all charges and was being framed by his girlfriend.[13] Plaintiffs claim that Guillot had an initial hearing on May 31, 2019, where his bail was set at $120,500.00.[14] After the initial hearing, Guillot was taken to the Jefferson Parish Correctional Center ("JPCC").[15] Plaintiffs contend that Guillot was "very upset and crying" during this time.[16]

Plaintiffs allege that upon arrival at JPCC, Guillot was interviewed by Nicole Wadlington ("Wadlington") an employee of CHJ, who noted that Guillot "had a prior mental health history including Post-traumatic Stress Disorder, Major Depression, and Anxiety."[17] Plaintiffs allege that Wadlington also noted Guillot's use of Effexor, a medication used to treat depression, and requested Guillot's medical records.[18] Plaintiffs claim that a second CHJ employee, Crystal Bradley ("Bradley") then performed a physical examination of Guillot and despite finding that Guillot's "attitude, affect/mood, hallucinations, and homicidal/suicidal assessments were all 'within normal limits,'" ordered a mental health appointment for Guillot "marked as high priority."[19] Plaintiffs allege that a third CHJ employee, Juanita Alexander-Sallier ("Sallier") examined Guillot and "again noted Mr. Guillot's history of Depression, Post-traumatic Stress

---

[12] *Id.* at 4.

[13] *Id.*

[14] *Id.* at 4–5.

[15] *Id.* at 5.

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] *Id.* at 5–6.

3

Disorder, and Anxiety" and "referred him to mental health."[20] Plaintiffs allege that on the same day, Bradley set up another mental health appointment for Guillot, again marked as high priority, but that the appointment was rescheduled several times.[21] Plaintiffs further claim that Guillot was not given his depression medication while incarcerated.[22]

Plaintiffs allege that Guillot was involved in a fight with another inmate on June 3, 2019.[23] Plaintiffs claim that "[i]n spite of multiple employees acknowledging the urgency of the situation," Guillot was medically cleared to be put into isolated housing.[24] Plaintiffs claim that Guillot was put into isolated housing on June 4, 2019.[25] Plaintiffs allege that the next day, June 5, 2019, Guillot committed suicide by "hang[ing] himself from the window grate in his private cell, using a bed sheet."[26]

In the instant suit, Plaintiffs claim that Defendants failed to "properly assess [Guillot] as a suicide risk, or even a potential risk, in spite of the fact that he presented at the jail informing them of prior hospitalization for psychiatric needs, and a diagnosis of anxiety, major depression, and Post Traumatic Stress Disorder (PTSD)."[27] Plaintiffs allege that Defendants "exhibited a wanton and reckless disregard for Mr. Guillot's safety by placing him in a private cell without a cell mate,

---

[20] *Id.* at 6.

[21] *Id.*

[22] *Id.* at 8–10.

[23] *Id.* at 6.

[24] *Id.*

[25] *Id.*

[26] *Id.*

[27] *Id.* at 2.

4

and doing nothing to prevent his suicide."[28] Plaintiffs assert that Defendants knew that Guillot was displaying "despair/hopelessness, great concern regarding 'what will happen to [him],' verbalization of a suicide plan, extreme restlessness exhibited by such behavior as continuous pacing, depressed state indicated by crying or insomnia, and concerns over events with significant others," yet Defendants still "failed to classify him as an actively suicidal inmate."[29] Additionally, according to the Amended Complaint, Guillot made several calls to his mother while detained at JPCC.[30] During one of the recorded phone calls, Plaintiffs allege that Guillot told his mother he was having suicidal thoughts.[31] Plaintiffs claim that Guillot's phone calls to his mother were never reviewed by CHJ, "even in spite of his obvious need [for] psychiatric care."[32]

Moreover, Plaintiffs allege that Defendants were on notice of the possibility of inmates committing suicide in isolated housing because three other inmates, Jerome Bell, Josh Belcher, and Jatory Evans, had previously committed suicide in the same manner as Guillot in solitary cells at JPCC between August and September 2017.[33] Plaintiffs allege that following the three suicides, Sheriff Lopinto "instituted an evaluation of the jail policies and procedures" and "requested an internal evaluation," which found that it was possible to change the makeup of the bars in the cells to limit future suicide attempts.[34] Plaintiffs allege that despite the numerous suicides and despite

---

[28] *Id.*

[29] *Id.* at 7–9, 11.

[30] *Id.* at 7.

[31] *Id.*

[32] *Id.* at 12.

[33] *Id.* at 7.

[34] *Id.* at 10 (internal quotation marks omitted).

being advised to alter the window bars in the solitary cells, Defendants failed to replace the window grates in the cells, failed to "monitor[] prisoners who are an obvious suicide risk," and "made a choice to place a prisoner who is clearly a self-proclaimed suicide risk in an area of the prison where it is difficult for Defendants and their employees to see inside the cells."[35]

Plaintiffs further claim that CHJ "has an established policy of deliberate indifference towards suicidal and potentially suicidal inmates' safety and providing necessary care."[36] Plaintiffs allege that CHJ has only one social worker, and employs only one psychiatrist on staff who visits JPCC one day per week.[37] Plaintiffs claim that CHJ has a "known custom and policy of delegating tasks to non-medical personnel that are only appropriate to be conducted by medical personnel."[38] Plaintiffs contend that the lack of mental health professionals present at JPCC violates CHJ's own Suicide Prevention Policy.[39]

Plaintiffs claim that CHJ's actions also violated the standards set out by the National Commission on Correctional Health Care ("NCCHC"), which CHJ adopted.[40] Plaintiffs claim that the NCCHC notified JPCC that it was not in compliance with several of its standards in 2017.[41] Specifically, NCCHC highlighted JPCC's failure to (1) review its policies for effectiveness; (2) provide inmates with an initial health assessment within 3 days of admission the jail; and (3)

---

[35] *Id.* at 7–11.

[36] *Id.* at 12.

[37] *Id.*

[38] *Id.* at 14.

[39] *Id.* at 12–13.

[40] *Id.* at 14–15.

[41] *Id.* at 15–17.

provide trained medical assistants, licensed practical nurses, or registered nurses for such screening.[42] Plaintiffs contend that Guillot was never screened by a qualified medical professional and "never saw a doctor or psychiatrist and never had a mental health evaluation at all for the entire 9 days he was detained prior to his suicide."[43] Plaintiffs claim that CHJ has a similar "poor record of prisoners in their care who commit suicides" at other jails for which CHJ provides medical services.[44]

In the Amended Complaint, Plaintiffs bring two claims under 42 U.S.C. § 1983, alleging that: (1) Defendants failed to manage, train, and supervise their staff and medical personnel at the jail in violation of the Eighth and Fourteenth Amendments and (2) Defendants deprived Guillot of adequate medical care in violation of the Fourteenth Amendment.[45] Plaintiffs do not bring an intentional infliction of emotional distress claim in the Amended Complaint.

On April 23, 2021, Moving Defendants filed the instant motion to dismiss.[46] On April 27, 2021, Plaintiffs filed an opposition.[47] On May 7, 2021, with leave of Court, Moving Defendants filed a reply in further support of the motion to dismiss.[48]

---

[42] *Id.*

[43] *Id.* at 18.

[44] *Id.* at 20–21.

[45] *Id.* at 23–24.

[46] Rec. Doc. 46.

[47] Rec. Doc. 47.

[48] Rec. Doc. 34.

## II. Parties' Arguments

### A.  *Moving Defendants' Arguments in Support of the Motion to Dismiss*

Moving Defendants contend that Plaintiffs' claims should be dismissed because Plaintiffs have failed to state a claim against CHJ under *Monell v. Department of Social Services*.[49] Moving Defendants contend that to state a *Monell* claim successfully, Plaintiffs may bring an episodic acts claim or a conditions of confinement claim, but for either Plaintiffs must show (i) that a constitutional violation occurred and (ii) that a CHJ policy was the moving force behind the violation.[50] According to Moving Defendants, Plaintiffs have failed to show either.

#### 1.  Inadequate Medical Care Claim

First, Moving Defendants argue that Plaintiffs' inadequate medical care claim should be dismissed. Moving Defendants contend that Plaintiffs have not adequately alleged that CHJ violated Guillot's constitutional rights.[51] Moving Defendants argue that to show a violation of Guillot's rights, Plaintiffs must "plead sufficient facts that show CHJ was deliberately indifferent to [Guillot]'s medical needs."[52] Moving Defendants claim that Plaintiffs have failed to show deliberate indifference because Guillot's medical records "unequivocally rebut any contention of deliberate indifference," as such records show that Guillot was medically evaluated five times during his ten days of incarceration at JPCC, was not assessed as a suicide risk, denied suicidal ideations, and "never conveyed any information to CHJ employees that would have made CHJ

---

[49] Rec. Doc. 46-1 (citing 436 U.S. 658, 691 (1978)).

[50] *Id.* at 2.

[51] *Id.*

[52] *Id.*

aware he was having mental health complaints, needed to see a mental health provider stat, or was a suicide risk."[53]

Moreover, Moving Defendants argue that both an incorrect diagnosis and the failure to provide Guillot with his medication, "absent signs of serious physical or psychological distress," does not establish deliberate indifference.[54] Moving Defendants contend that Plaintiffs have not provided any facts showing that Guillot asked for his medication or that CHJ knew Guillot was considering suicide.[55] Given that Plaintiffs have not shown a constitutional violation, Moving Defendants contend that Plaintiffs' *Monell* claims must be dismissed.[56]

Even if Plaintiffs have alleged a constitutional violation for inadequate medical care, Moving Defendants argue that Plaintiffs have failed to meet the second prong of the *Monell* analysis—showing that a custom, policy, or practice of CHJ was a moving force behind such violation.[57] Moving Defendants claim that Plaintiffs have provided only conclusory statements that a widespread practice and policy of deliberate indifference existed, which is insufficient without supporting facts.[58] Moving Defendants argue that previous suicides at JPCC and other jails are likewise insufficient to show a widespread practice of deliberate indifference.[59] Moving Defendants contend that Plaintiffs' arguments surrounding Defendants' alleged failure to follow a

---

[53] *Id.* at 4–6.

[54] *Id.* at 6–9.

[55] *Id.* at 8–9.

[56] *Id.* at 10.

[57] *Id.* at 11.

[58] *Id.*

[59] *Id.* at 11–12.

policy show at most negligence by Defendants, not "moving force causation."[60] Moreover, Moving Defendants contend that Plaintiffs' arguments regarding Defendants' alleged failure to abide by the National Commission on Correctional Health Care standards are also insufficient to show the required causation under Plaintiffs' *Monell* claims.[61]

### 2.      Failure to Train Claim

Next, Moving Defendants argue that Plaintiffs' failure to train claim also fails under *Monell*.[62] To plead a failure to train claim successfully, Moving Defendants contend that Plaintiffs must show that (i) CHJ failed to supervise or train staff; (ii) the failure to supervise or train caused the alleged constitutional violation; and (iii) such failure constituted deliberate indifference.[63] According to Moving Defendants, Plaintiffs have failed to adequately plead any of the three required elements.[64]

First, Moving Defendants contend that Plaintiffs have not shown that CHJ failed to train the staff members involved in caring for Guillot.[65] Moving Defendants claim that there is no constitutional requirement for custodial officials to have specific training.[66] Instead, such officials are only required to be trained to detect obvious medical needs.[67] Moving Defendants argue that

---

[60] *Id.* at 13.

[61] *Id.* at 13–14.

[62] *Id.* at 14.

[63] *Id.* at 15.

[64] *Id.*

[65] *Id.*

[66] *Id.* at 15–16.

[67] *Id.*

Guillot's medical records make clear that he denied having suicidal thoughts, never requested treatment, and never indicated the need to see a medical professional.[68] Second, Moving Defendants argue that Plaintiffs have not adequately pleaded that any CHJ training policy caused a violation of Guillot's constitutional rights.[69] Moving Defendants contend that Plaintiffs state only conclusions that "lump all defendants together," which are insufficient to state a claim.[70]

Third, Moving Defendants argue that Plaintiffs have not adequately pleaded that CHJ was deliberately indifferent in "adopting its training policy."[71] According to Moving Defendants, to show deliberate indifference, Plaintiffs must allege a pattern of similar constitutional violations or meet the "single-incident exception."[72] Moving Defendants claim that Plaintiffs have failed to plead either.[73] Moving Defendants contend that Plaintiffs have failed to show a pattern of similar constitutional violations by CHJ employees.[74] Further, Moving Defendants argue that to meet the "single-incident exception," Guillot's suicide must have been a "highly predictable consequence" of CHJ's failure to train, requiring a showing that CHJ failed to train its employees "concerning a clear constitutional duty."[75] Moving Defendants contend that Plaintiffs have failed to allege facts in support of this single-incident exception because there is no constitutional requirement for the

---

[68] *Id.* at 16.

[69] *Id.* at 17.

[70] *Id.* at 17–18.

[71] *Id.* at 19.

[72] *Id.*

[73] *Id.*

[74] *Id.*

[75] *Id.* at 20.

"implementation of adequate suicide policies" and because such exception is "reserved for cases in which the government actor was provided no training whatsoever."[76]

### 3.    Additional Arguments in Support of the Motion

Outside of arguing in favor of dismissal of Plaintiffs' *Monell* claims, Moving Defendants make several additional arguments. First, Moving Defendants contend that although Plaintiffs submitted a claim for intentional infliction of emotional distress in the Complaint, they failed to include such claim in the Amended Complaint and the claim should therefore be dismissed.[77] Next, Moving Defendants argue that Plaintiffs cannot recover punitive damages under Section 1983, as such damages are impermissible when sought from a municipality and because Plaintiffs' suit against CHJ is "simply another way of alleging municipal liability."[78] Finally, Moving Defendants argue that Plaintiffs' request for declaratory and injunctive relief should be dismissed as moot because Guillot is no longer incarcerated.[79]

### B.    *Plaintiffs' Arguments in Opposition to the Motion to Dismiss*

### 1.    Inadequate Medical Care Claim

In opposition, Plaintiffs argue that they have sufficiently pleaded deliberate indifference to give rise to a *Monell* claim.[80] Plaintiffs claim that they have pleaded both a conditions of confinement claim as well as an episodic acts claim.[81] Plaintiffs contend that they "have expressly

---

[76] *Id.* at 20–24.

[77] *Id.* at 25.

[78] *Id.* at 25–26.

[79] *Id.* at 26.

[80] Rec. Doc. 47 at 4.

[81] *Id.*

pleaded that the delay/denial of mental health treatment and prescribed medication in accordance with the Defendant's proscribed policy, violated Mr. Guillot's constitutional rights and ultimately contributed to the cause of his death."[82] Plaintiffs point to their allegations of CHJ's "ongoing policy of untrained personnel conducting initial mental health assessments" and "policy of non-conformity to the NCCHC self-adopted standards" as sufficient to state a *Monell* claim.[83]

Plaintiffs contend that CHJ acted with deliberate indifference because Guillot was denied medical treatment, not simply provided "sub-standard treatment."[84] Plaintiffs claim that CHJ employees were deliberately indifferent in refusing to provide Guillot with his depression medication because they "either didn't know of the risks of abrupt medication cessation due to lack of training, or they deliberately disregarded the fact that Mr. Guillot was taking 150 milligrams of Effexor, and should have resumed his medication regimen upon admission."[85]

Plaintiffs argue that despite Guillot "exhibiting signs of extreme psychological distress," he was denied his medication, in violation of his constitutional rights.[86] Plaintiffs contend that "[t]his [C]ourt can draw the inference that proper training would have resulted in CorrectHealth's staff initiating an immediate request to verify Mr. Guillot's medication."[87] Plaintiffs argue that

---

[82] *Id.*

[83] *Id.*

[84] *Id.* at 5–8.

[85] *Id.* at 9.

[86] *Id.* at 10.

[87] *Id.*

CHJ had notice that Guillot was at risk of substantial harm as evidenced by CHJ referring Guillot to mental health evaluations and marking him as "high priority."[88]

### 2.    Failure to Train Claim

Furthermore, Plaintiffs argue that they have properly alleged a *Monell* claim for failure to train.[89] Plaintiffs allege that CHJ permits non-qualified employees to determine whether an inmate is at risk of suicide.[90] Plaintiffs claim that CHJ employees did not even have the "minimal training" required of custodial employees.[91] Finally, Plaintiffs claim that they have adequately pleaded facts that fall within the single incident exception.[92]

### 3.    Response to Defendants' Additional Arguments

Plaintiffs concede that the claim for intentional infliction of emotional distress asserted in the original Complaint was intentionally omitted from the Amended Complaint and should be dismissed.[93] Plaintiffs further agree with Moving Defendants that any requests for punitive damages and injunctive relief are moot and should be dismissed.[94]

---

[88] *Id.* at 11.

[89] *Id.* at 13.

[90] *Id.*

[91] *Id.* at 13–14.

[92] *Id.* at 14.

[93] *Id.* at 16.

[94] *Id.*

### C.    *Moving Defendants' Arguments in Further Support of the Motion to Dismiss*

#### 1.    **Inadequate Medical Care Claim**

In reply, Moving Defendants re-assert that Plaintiffs have not shown that a constitutional violation occurred.[95] Moving Defendants contend that Guillot had no right under the Constitution to be screened for suicide upon booking at JPCC, nor a right to be evaluated by medical professionals.[96] Likewise, Moving Defendants argue that Plaintiffs have failed to allege deliberate indifference because Guillot was seen by CHJ staff five times, denied suicidal thoughts, and did not request treatment or medication.[97] Therefore, Moving Defendants contend that Plaintiffs cannot show that CHJ employees had subjective knowledge of a substantial risk of serious harm.[98] Moving Defendants further highlight that although Plaintiffs allege that Guillot was exhibiting signs of psychological distress, the Amended Complaint fails to allege that CHJ had knowledge of Guillot's actions and mental health.[99] Moving Defendants contend that placement of Guillot in solitary confinement did not violate his constitutional rights.[100]

Moving Defendants further argue that Plaintiffs have not shown that any CHJ policy or practice was the moving force behind a constitutional violation.[101] Moving Defendants claim that standards set out by NCCHC do not "establish the constitutional minimum," and claim that

---

[95] Rec. Doc. 50 at 1.

[96] *Id.* at 2.

[97] *Id.* at 2–4.

[98] *Id.*

[99] *Id.* at 4.

[100] *Id.* at 5–6.

[101] *Id.* at 7.

Plaintiffs' allegations regarding incidents at other facilities do not establish a policy or practice relevant to Plaintiffs' claims in the instant case.[102]

### 2.    Failure to Train Claim

Moreover, Moving Defendants claim that Plaintiffs have not adequately pleaded a failure to train claim.[103] Moving Defendants argue that Plaintiffs have not shown that CHJ employed inadequate training policies, nor that any training policy was a moving force behind a constitutional violation, nor that CHJ was deliberately indifferent.[104] Specifically as to the last element, Moving Defendants claim that Plaintiffs have not shown a pattern of similar violations by untrained employees or "availed themselves of the extremely narrow single-incident exception."[105] Moving Defendants further argue that Plaintiffs' arguments are inconsistent, as Plaintiffs allege that CHJ employees were deficiently trained yet also allege that CHJ employees were deliberately indifferent.[106]

Finally, Moving Defendants claim that Plaintiffs failed to plead a conditions of confinement claim in the Amended Complaint, and cannot now attempt to plead such claim in the opposition brief.[107]

---

[102] *Id.* at 8.

[103] *Id.* at 9.

[104] *Id.* at 9–10.

[105] *Id.* at 10–11 (internal quotation marks omitted).

[106] *Id.* at 11.

[107] *Id.* at 12.

### III. Legal Standards

#### A.   *Legal Standard on a Rule 12(b)(6) Motion to Dismiss*

Federal Rule of Civil Procedure 12(b)(6) provides that an action may be dismissed "for failure to state a claim upon which relief can be granted."[108] A motion to dismiss for failure to state a claim is "viewed with disfavor and is rarely granted."[109] "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face."[110]

The "[f]actual allegations must be enough to raise a right to relief above the speculative level."[111] The complaint need not contain detailed factual allegations, but it must offer more than mere labels, legal conclusions, or formulaic recitations of the elements of a cause of action.[112] That is, the complaint must offer more than an "unadorned, the defendant-unlawfully-harmed-me accusation."[113]

Although a court must accept all "well-pleaded facts" as true, a court need not accept legal conclusions as true.[114] "[L]egal conclusions can provide the framework of a complaint, [but] they

---

[108] Fed. R. Civ. P. 12(b)(6).

[109] *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir. 1982).

[110] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (internal quotation marks omitted).

[111] *Twombly*, 550 U.S. at 555. Put another way, a plaintiff must plead facts that allow the court to draw a "reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

[112] *Iqbal*, 556 U.S. at 678.

[113] *Id*.

[114] *Id.* at 677–78.

must be supported by factual allegations."[115] Similarly, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" will not suffice.[116] If the factual allegations are insufficient to raise a right to relief above the speculative level, or an "insuperable" bar to relief exists, the claim must be dismissed."[117]

A court considering a motion to dismiss "must limit itself to the contents of the pleadings, including attachments thereto."[118] Attachments to a motion to dismiss are, however, "considered part of the pleadings" if "they are referred to in the plaintiff's complaint and are central to her claim."[119] "In so attaching, the defendant merely assists the plaintiff in establishing the basis of the suit, and the court in making the elementary determination of whether a claim has been stated."[120]

## B.    Corporate Liability Under 42 U.S.C. § 1983

42 U.S.C. § 1983 provides that every "person" who, under color of any statute, ordinance, regulation, custom, or usage of any State subjects, or "causes to be subjected," any person to the deprivation of any federally protected rights, privileges, or immunities shall be civilly liable to the injured party. "Section 1983 provides a cause of action against any person who deprives an

---

[115] *Id.* at 679.

[116] *Id.* at 678.

[117] *Carbe v. Lappin*, 492 F.3d 325, 328 n.9 (5th Cir. 2007); *Moore v. Metro. Human Serv. Dep't*, No. 09-6470, 2010 WL 1462224, at * 2 (E.D. La. Apr. 8, 2010) (Vance, J.) (citing *Jones v. Bock*, 549 U.S. 199, 215 (2007)).

[118] *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000).

[119] *Id.* at 498–99 (quoting *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993)) (internal quotation marks omitted).

[120] *Carter v. Target Corp.*, 541 F. App'x 413, 416–17 (5th Cir. 2013) (quoting *Collins*, 224 F.3d at 498–99).

individual of federally guaranteed rights 'under color' of state law."[121] "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'"[122] The Supreme Court has held that "[t]o act 'under color' of law does not require that the accused be an officer of the state."[123]

"Under the Supreme Court's 'public function' test, a private entity acts under color of state law 'when that entity performs a function which is traditionally the exclusive province of the state.'"[124] "Alternatively, state action may be found where there is a nexus between the state and the action of the private defendant such that the action is fairly attributable to the state."[125] This means "the plaintiff must show: (1) that the deprivation was caused by the exercise of some right or privilege created by the state or by a rule of conduct imposed by the state, or by a person for whom the state is responsible, and (2) that the party charged with the deprivation may fairly be said to be a state actor."[126] A plaintiff can make such a showing by demonstrating that "the private citizen was a willful participant in joint activity with the State or its agents."[127] However, "State action will not accrue merely because of government acquiescence or approval of the private

---

[121] *Filarsky v. Delia*, 566 U.S. 377, 383 (2012) (quoting 42 U.S.C. § 1983).

[122] *West v. Atkins*, 487 U.S. 42, 49 (1988) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)).

[123] *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970) (internal quotation marks and citation omitted).

[124] *Rosborough v. Mgmt. & Training Corp.*, 350 F.3d 459, 460 (5th Cir. 2003) (quoting *Wong v. Stripling*, 881 F.2d 200, 202 (5th Cir. 1989)).

[125] *Wong*, 881 F.2d at 202.

[126] *Priester v. Lowndes Cnty.*, 354 F.3d 414, 423 (5th Cir.), *cert. denied* 543 U.S. 829 (2004) (citing *Daniel v. Ferguson*, 839 F.2d 1124, 1130 (5th Cir. 1988)).

[127] *Id.* at 420 (internal quotation marks omitted) (quoting *Cinel v. Connick*, 15 F.3d 1338, 1343 (5th Cir. 1994)).

entity's actions."[128]

The Supreme Court has held that municipal entities and corporations are "persons" under the definition of § 1983.[129] Such an entity may, however, not be held liable under Section 1983 based upon a theory of vicarious liability or *respondeat superior*.[130] Instead, a plaintiff must allege both (i) "that a constitutional violation occurred" and (ii) "that a municipal [or corporate] policy was the moving force behind the violation."[131] Under the latter, a plaintiff must show three things: (1) an "official policy or custom 'was a cause in fact of the deprivation of rights inflicted,'[132] (2) the policy "served as a moving force" behind the constitutional violation,[133] and (3) the policy was decided on by a policymaker with "either actual or constructive knowledge of the alleged policy."[134]

To satisfy the first requirement, the Supreme Court, in *Monell v. Department of Social Services of New York*, set out the possible methods of showing a policy or custom: "(1) [an] express policy of violating the Constitution, (2) a widespread practice or custom—even if that custom has not received formal approval by an official decision-making body—or (3) a decision by an

---

[128] *Id.* at 423 (citing *Yeager v. City of McGregor*, 980 F.2d 337, 342 (5th Cir. 1993)).

[129] *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 810 (1985).

[130] *Green v. Albertson's, Inc.*, 67 F. App'x 248, at *2, n.3 (citing *Monell*, 436 U.S. at 691).

[131] *Sanchez v. Young Cnty., Texas*, 956 F.3d 785, 791 (5th Cir.), *cert. denied,* 141 S. Ct. 901, 208 L. Ed. 2d 455 (2020).

[132] *Spiller v. City of Texas City, Police Dept.*, 130 F.3d 162, 167 (5th Cir. 1997) (quoting *Leffall v. Dallas Indep. Sch. Dist.*, 28 F.3d 521, 525 (5th Cir. 1994)).

[133] *Id.* (internal citations and quotation marks omitted).

[134] *Cox v. City of Dallas*, 430 F.3d 734, 748–49 (5th Cir. 2005) (citing *Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001)).

individual with express policy-making authority."[135] Under Fifth Circuit precedent, a custom may be evidenced by "a persistent, widespread practice of [] officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents [corporate] policy . . . Actions of officers or employees of a [corporation] do not render the [corporation] liable under section 1983 unless they execute official policy. . . ."[136] This standard requires that "[the] actions must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of [corporate] employees."[137] "Isolated unconstitutional actions by [corporate] employees will almost never trigger liability,"[138] and "[a] customary [corporate] policy cannot ordinarily be inferred from single constitutional violations."[139]

## IV. Analysis

As an initial matter, the parties agree that the intentional infliction of emotional distress claim brought by Plaintiffs in the initial Complaint should be dismissed. The parties further agree that any requests for punitive damages or injunctive relief should be dismissed. Accordingly, the Court dismisses the intentional inflection of emotional distress claim and Plaintiffs' requests for punitive damages and injunctive relief.

---

[135] *Cardenas v. Lee Cnty., Tex.*, 569 F. App'x 252, 255 (5th Cir. 2014) (citing *Monell,* 436 U.S. at 690–91).

[136] *Piotrowski*, 237 F.3d at 579 (quoting *Webster v. City of Houston,* 735 F.2d 838, 842 (5th Cir. 1984) (en banc)).

[137] *Webster*, 735 F.2d at 842.

[138] *Piotrowski*, 273 F.3d at 578 (citing *Bennett v. City of Slidell,* 728 F.2d 762, 768 n. 3 (5th Cir. 1984)).

[139] *Id.* at 581.

Two claims raised by Plaintiffs remain against CHJ and Ironshore (as CHJ's insurer) under 42 U.S.C. § 1983: (1) failure to manage, train, and supervise staff and medical personnel at JPCC in violation of the Eighth and Fourteenth Amendments and (2) inadequate medical care in violation of the Fourteenth Amendment.[140] For pretrial detainees specifically, a Section 1983 claim should be brought pursuant to the Fourteenth Amendment, rather than the Eighth Amendment, as "[t]he constitutional rights of a pretrial detainee are found in the procedural and substantive due process guarantees of the Fourteenth Amendment."[141] Guillot was a pretrial detainee and thus, Plaintiffs' claims under the Eighth Amendment must be dismissed.[142]

As to Plaintiffs' Fourteenth Amendment claims, a corporation may be liable for a violation of an individual's rights pursuant to 42 U.S.C. § 1983 and the standard laid out in *Monell v. Department of Social Services of New York*.[143] As stated above, this requires Plaintiffs to allege both (i) "that a constitutional violation occurred" and (ii) "that a municipal [or corporate] policy was the moving force behind the violation."[144] "When attributing violations of pretrial detainees' rights to [corporations], the cause of those violations is characterized either as a condition of confinement or as an episodic act or omission."[145] The Fifth Circuit has noted that "there is no rule

---

[140] Rec. Doc. 41 at 23–24.

[141] *Est. of Henson v. Wichita Cnty., Tex.*, 795 F.3d 456, 462 (5th Cir. 2015).

[142] *Cadena v. El Paso Cnty.*, 946 F.3d 717, 727 (5th Cir. 2020).

[143] *Garza v. City of Donna*, 922 F.3d 626, 632 (5th Cir. 2019), *cert. denied sub nom. Garza v. City of Donna, Texas*, 140 S. Ct. 651 (2019).

[144] *Sanchez*, 956 F.3d at 791.

[145] *Garza*, 922 F.3d at 632.

barring a plaintiff from pleading both alternative theories, and a court may properly evaluate each separately."[146] The Fifth Circuit has distinguished the two as follows.

A condition of confinement claim is "a challenge to general conditions, practices, rules, or restrictions of pretrial confinement."[147] Notably, "[i]n some cases, a condition may reflect an unstated or *de facto* policy, as evidenced by a pattern of acts or omissions 'sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by [jail] officials, to prove an intended condition or practice.'"[148] In analyzing such claims, "the proper inquiry is whether those conditions amounted to punishment of the detainee."[149] "If a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees."[150] In sum, therefore, a plaintiff must prove three elements to establish an unconstitutional conditions of confinement claim: "(1) a rule or restriction or ... the existence of an identifiable intended condition or practice ... [or] that the jail official's acts or omissions were sufficiently extended or pervasive; (2) which was not reasonably related to a legitimate governmental objective; and (3) which caused the violation of [a detainee's]

---

[146] *Est. of Henson*, 795 F.3d at 464.

[147] *Id.* at 463 (citing *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 644 (5th Cir. 1996)) (internal quotation marks omitted).

[148] *Shepherd v. Dallas Cnty.*, 591 F.3d 445, 452 (5th Cir. 2009) (alteration in original) (quoting *Hare*, 74 F.3d at 645).

[149] *Bell v. Wolfish*, 441 U.S. 520, 535 (1979).

[150] *Id.* at 539.

constitutional rights."[151] A plaintiff "need not demonstrate that the state actor or municipal entity acted with intent to punish."[152]

By contrast, an episodic acts or omissions claim "faults specific jail officials for their acts or omissions."[153] "In such a case, an actor is interposed between the detainee and the [corporation], such that the detainee complains first of a particular act of, or omission by, the actor and then points derivatively to a policy, custom, or rule (or lack thereof) of the [corporation] that permitted or caused the act or omission."[154] A plaintiff proving a violation of their constitutional rights under an episodic acts or omission claim must establish that officials acted "with subjective deliberate indifference."[155] A showing of deliberate indifference requires that "the state official must know of and disregard an excessive risk to inmate health or safety" and must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."[156]

Moving Defendants contend that Plaintiffs cannot satisfy the foregoing requirements for either Plaintiffs' inadequate medical care claim or Plaintiffs' failure to train claim, and thus, such claims must be dismissed. The Court will analyze each claim in turn.

---

[151] *Montano v. Orange Cnty., Texas*, 842 F.3d 865, 874 (5th Cir. 2016) (quoting *Est. of Henson*, 795 F.3d at 468) (internal quotation marks omitted).

[152] *Est. of Henson*, 795 F.3d at 463.

[153] *Shepherd v. Dallas Cnty.*, 591 F.3d at 452.

[154] *Est. of Henson*, 795 F.3d at 463 (quoting *Scott v. Moore*, 114 F.3d 51, 53 (5th Cir. 1997) (en banc)) (internal quotation marks omitted).

[155] *Garza*, 922 F.3d at 634.

[156] *Est. of Henson*, 795 F.3d at 464 (internal citations and quotation marks omitted).

### A.    *Inadequate Medical Care Claim*

Plaintiffs bring a claim against CHJ under 42 U.S.C. § 1983 for violating Guillot's Fourteenth Amendment right to adequate medical care.[157] The Due Process Clause of the Fourteenth Amendment provides pretrial detainees with, among other things, the right to medical care and the right to protection from known suicidal tendencies.[158] To determine whether there has been a violation of such rights, the Fifth Circuit has instructed courts to characterize a claim as either "an attack on a condition of confinement or as an episodic act or omission."[159]

In the Amended Complaint, Plaintiffs do not specify which type of claim—episodic acts or conditions of confinement—they are bringing against CHJ. In the opposition brief, Plaintiffs allege that they have stated a claim for a conditions of confinement claim and an episodic acts claim.[160] However, the Fifth Circuit has noted that "when [an official's] actions were interposed between the county and the decedent, it [is] clear that the case was one for an episodic act or omission."[161] The Fifth Circuit has further noted that a "complaint [which] turns on [jail officials'] alleged failure to take better care of [an individual], and [a jail official's] failure to medically screen [the individual] and secure [the individual] to treatment . . . perfectly fits the definition of the episodic omission."[162] Specifically, the Fifth Circuit has treated claims related to suicides at jails

---

[157] Rec. Doc. 41 at 24.

[158] *Garza*, 922 F.3d at 632.

[159] *Shepherd*, 591 F.3d at 452.

[160] Rec. Doc. 47 at 4.

[161] *Woodward v. Lopinto*, No. 18-4236, 2021 WL 1969446, at *3 (E.D. La. May 17, 2021) (citing *Anderson v. Dallas Cty. Texas*, 286 F. App'x 850, 858 (5th Cir. 2008)).

[162] *Id.* (citing *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 526 (5th Cir. 1999)).

25

as episodic claims.[163] In light of this precedent, this Court will analyze Plaintiffs' inadequate medical care claim as an episodic acts or omission claim.

To establish corporate liability in an episodic act case, a plaintiff must show "(1) that the [corporate] employee violated the pretrial detainee's clearly established constitutional rights with subjective deliberate indifference; and (2) that this violation resulted from a [corporate] policy or custom adopted and maintained with objective deliberate indifference."[164] "A policy or custom may be attributed to a [corporate] defendant through the identification of a final policymaking authority."[165]

### 1. Whether CHJ Violated Guillot's Fourteenth Amendment Right to Medical Care

To state a claim for a violation of Guillot's Fourteenth Amendment rights, Plaintiffs must show subjective deliberate indifference—that CHJ had actual knowledge that Guillot "face[d] a substantial risk of serious harm" and that CHJ "disregard[ed] that risk by failing to take reasonable measures to abate it."[166] "The deliberate indifference standard is a subjective inquiry; the plaintiff must establish that the jail officials were actually aware of the risk, yet consciously disregarded it."[167] "Deliberate indifference cannot be inferred from a prison official's mere failure to act reasonably, i.e., it cannot be inferred from negligence alone."[168] "Whether a prison official had the

---

[163] *Anderson*, 286 F. App'x at 858 (citing *Flores v. Cnty. of Hardeman, Tex.*, 124 F.3d 736, 738 (5th Cir. 1997); *Sibley v. Lemaire*, 184 F.3d 481, 485 (5th Cir.1999)).

[164] *Garza*, 922 F.3d at 634 (quoting *Brumfield v. Hollins*, 551 F.3d 322, 331 (5th Cir. 2008)) (internal quotation marks omitted).

[165] *Id.* at 637.

[166] *Hare*, 74 F.3d at 648 (citing *Farmer v. Brennan*, 511 U.S. 825, 825 (1994)).

[167] *Lawson v. Dallas Cnty.*, 286 F.3d 257, 262 (5th Cir. 2002).

[168] *Id.* at 262–63.

requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."[169]

Moving Defendants contend that Plaintiffs have not adequately pleaded facts that support a finding of deliberate indifference.[170] Specifically, Moving Defendants claim that Guillot was seen multiple times by medical staff, denied suicidal ideations, and presented "no other acute signs of symptoms suggesting he needed immediate medical intervention."[171] Moving Defendants contend that Guillot's medical records "unequivocally rebut any contention of deliberate indifference," and argue that CHJ's failure to diagnosis Guillot as a suicide risk, as well as to distribute Guillot his medication, does not constitute deliberate indifference.[172]

The Court disagrees. Plaintiffs have pleaded facts to state a claim that CHJ acted with deliberate indifference to Guillot's medical needs despite having ample knowledge of the state of his mental health. Plaintiffs allege—and the medical records confirm—that Guillot was initially interviewed by a Nicole Wadlington, a CHJ employee, on May 26, 2019, the date of his arrest.[173] On the intake screening form, Wadlington noted that Guillot had a prior history of "Post-traumatic Stress Disorder, Major Depression, and Anxiety."[174] Wadlington also noted Guillot's use of a

---

[169] *Farmer*, 511 U.S. at 842.

[170] Rec. Doc. 46-1 at 2.

[171] *Id.* at 4–5.

[172] *Id.* at 6–10.

[173] Rec. Doc. 41 at 5.

[174] *Id.*

medication for depression and requested Guillot's medical records.[175] A second CHJ employee, Crystal Bradley, then performed a physical examination of Guillot.[176] Despite finding that Guillot's "attitude, affect/mood, hallucinations, and homicidal/suicidal assessments were all within normal limits," Bradley ordered a mental health appointment for Guillot "marked as high priority."[177] Another mental health appointment was set up for Guillot, again marked as high priority, but was rescheduled several times.[178] A third employee, Juanita Alexander-Sallier, examined Guillot and likewise referred him to mental health.[179]

Through these allegations, Plaintiffs have stated a claim for deliberate indifference, as Plaintiffs allege that CHJ employees were aware of Guillot's mental health history and current mental state, even without Guillot himself specifically requesting mental health treatment, and were aware of the substantial risk of harm as a result of Guillot's mental health. While Moving Defendants claim that "it is undisputed that in the 10 days of [Guillot]'s incarceration," all of his examinations were "normal,"[180] the medical records do not support this assertion. Instead, the records demonstrate that CHJ employees were concerned about Guillot's mental health and referred him for treatment multiple times. Moreover, several of the referrals were marked as high priority. Despite these high priority referrals, Plaintiffs claim that Guillot never received any

---

[175] *Id.*

[176] *Id.* at 5–6.

[177] *Id.* at 6.

[178] *Id*.

[179] *Id.*

[180] Rec. Doc. 46-1 at 5.

mental health treatment.[181] This alleged disregard for Guillot's urgent mental health needs rises to the level of deliberate indifference.

Further, Plaintiffs have alleged that CHJ employees acted with deliberate indifference by failing to give Guillot his depression medication during his incarceration at JPCC.[182] Moving Defendants contend that "[t]he failure to distribute medication to a pretrial detainee, absent signs of serious physical or psychological distress, does not violate the Constitution."[183] However, Plaintiffs have provided sufficient facts to show that CHJ was aware of Guillot's "serious physical or psychological distress" yet failed to act, and that this failure was deliberately indifferent.

Taking all facts in the light most favorable to Plaintiffs, a reasonable factfinder could conclude that CHJ employees knew of, and disregarded, a substantial risk of harm to Guillot. Therefore, Plaintiffs have stated a claim that CHJ acted with deliberate indifference.

## 2.   Whether a CHJ Policy or Custom was the Moving Force Behind the Violation

Given that CHJ is a corporate entity, it is not liable for injuries "inflicted solely by its employees or agents[; rather] it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."[184] Thus, Plaintiffs must show "either written policy statements, ordinances, or regulations or a widespread practice that is so common and well-settled as to . . . fairly represent[] [corporate] policy that was

---

[181] *Id.* at 6.

[182] Rec. Doc. 41 at 8.

[183] Rec. Doc. 46-1 at 8.

[184] *Phoenix on behalf of S.W. v. Lafourche Par. Gov't*, No. 19-13004, 2020 WL 3269114, at *13 (E.D. La. June 17, 2020) (Feldman, J.).

the moving force behind the violation."[185] Plaintiffs must show that this corporate policy or custom was "adopted and maintained with objective deliberate indifference." [186] Further, Plaintiffs must attribute the policy or custom to the corporation "through the identification of a final policymaking authority."[187] In the instant motion, Moving Defendants do not contest the existence of a final policymaking authority, but argue that Plaintiffs have not alleged a policy or practice that caused Guillot's inadequate medical care.

Despite Moving Defendants' arguments to the contrary, Plaintiffs have alleged a policy or practice that was the moving force behind the violation of Guillot's right to adequate medical care. To survive a motion to dismiss, the complaint's "description of a policy or custom and its relationship to the underlying constitutional violation . . . cannot be conclusory; it must contain specific facts."[188] "[P]leadings are sufficient when they make specific factual allegations that allow a court to reasonably infer that a policy or practice exists and that the alleged policy or practice was the moving force behind [corporate] employees' deliberate indifference to an inmate's serious medical needs."[189]

In the Amended Complaint, Plaintiffs allege that CHJ has a "known custom and policy of delegating tasks to non-medical personnel that are only appropriate to be conducted by medical

---

[185] *Cadena*, 946 F.3d at 728 (quoting *James v. Harris Cnty.*, 577 F.3d 612, 617 (5th Cir. 2009)) (internal quotation marks omitted).

[186] *Garza*, 922 F.3d at 634 (quoting *Brumfield*, 551 F.3d at 331) (internal quotation marks omitted).

[187] *Id.* at 637.

[188] *Balle v. Nueces Cnty.*, 952 F.3d 552, 559 (5th Cir. 2017) (quoting *Spiller*, 130 F.3d at 167).

[189] *Id*. (citing *Colle v. Brazos Cnty.*, 981 F.2d 237, 245 (5th Cir. 1993)).

personnel."[190] Plaintiffs further claim that CHJ allows "social workers and untrained employees to perform tasks that should only be delegated to trained medical personnel."[191] Plaintiffs contend that CHJ was aware that "problems existed with regard to their mental health policies" but "intentionally refused to remedy the deficiencies," and therefore acted with deliberate indifference in maintaining such inadequate policies and practices.[192]

In support of this argument, Plaintiffs point to the three prior suicides that occurred at JPCC.[193] While this Court did note in its March 1, 2021 Order on Moving Defendants' first motions to dismiss that Plaintiffs' allegations regarding the three previous suicides failed to show a pattern or practice of CHJ misclassifying suicidal inmates, as the three men *were* properly classified as suicidal prior to their suicides unlike Guillot,[194] Plaintiffs' argument in the Amended Complaint differs. Plaintiffs posit that the three previous suicides evidence a pattern of CHJ improperly delegating medical decisions to non-medical personnel.[195] Plaintiffs contend that Guillot was seen by untrained medical staff during his time of incarceration. Similarly, Plaintiffs allege that Joshua Belcher, Jatory Evans, and Jerome Bell were treated by David Jennings, a social worker, prior to their suicides instead of a trained medical professional.[196] These past instances

---

[190] Rec. Doc. 41 at 14.

[191] *Id.* at 19.

[192] *Id.*

[193] *Id.* at 18.

[194] Rec. Doc. 37 at 21.

[195] Rec. Doc. 41 at 18.

[196] *Id.*

cited by Plaintiffs show a pattern of CHJ delegating medical decisions to non-medical personnel. Therefore, Plaintiffs have stated a claim under *Monell*.[197]

Plaintiffs also allege that CHJ's practice of delegating to non-medical personnel was the "moving force" behind the alleged denial of Guillot's constitutional right to adequate medical care. Specifically, Plaintiffs allege "[n]one of the intake personnel who assisted in Marshall Guillot's health or mental health screening possessed the proper licensure, certification, and qualifications necessary to make an accurate determination of his mental health needs, and whether or not he was suicidal."[198] Notably, the Fifth Circuit has held that a plaintiff is not required to show "that a policy or practice was the *exclusive* cause of the constitutional deprivation," but instead that courts "may . . . consider how individual policies or practices interact with one another within the larger system."[199] Here, Plaintiffs have sufficiently alleged that Guillot's rights were violated at least in part due to CHJ's lack of trained, medical personnel handling his medical treatment.

Given that Plaintiffs have adequately alleged a constitutional violation of Guillot's right to medical care through deliberate indifference, as well as the existence of a CHJ policy or practice that led to this violation, Plaintiffs have stated a claim against CHJ under *Monell*. Therefore, the Court denies the instant motion to the extent it seeks dismissal of Plaintiffs' inadequate medical care claim.

---

[197] While Moving Defendants focus in the instant motion on the NCCHC standards alleged by Plaintiffs in the Amended Complaint, Plaintiffs' opposition brief instead highlights CHJ's alleged pattern of improper delegation of medical tasks to unqualified personnel to satsify *Monell*. Rec. Doc. 47 at 12–13.

[198] Rec. Doc. 41 at 18.

[199] *Sanchez*, 956 F.3d at 795 (internal quotation marks omitted).

### B.       *Failure to Train & Supervise Claim*

Plaintiffs also bring a claim against CHJ for violating Guillot's rights under the Fourteenth Amendment[200] by failing to train and supervise CHJ employees.[201] Specifically, Plaintiffs allege that CHJ was "grossly negligent, reckless, and deliberately indifferent in managing, training, and supervising their subordinates, and medical personnel that interacted with Marshall Guillot."[202]

"It is well-established that a [corporation's] failure to train its [] officers can give rise to § 1983 liability."[203] To establish a failure to train claim, a plaintiff must show "(1) that the [corporation's] training procedures were inadequate, (2) that the [corporation] was deliberately indifferent in adopting its training policy, and (3) that the inadequate training policy directly caused the violations in question."[204]

First, Plaintiffs have adequately alleged that CHJ's training and supervision procedures were inadequate and that this inadequate training led to the violations of Guillot's constitutional rights. The Fifth Circuit has held that "[i]n the specific context of prison suicide prevention, municipalities [or corporations] must provide custodial officials with minimal training to detect *obvious* medical needs of detainees with *known, demonstrable,* and serious medical disorders, but a failure to train custodial officials in screening procedures to detect *latent* suicidal

---

[200] Plaintiffs also assert the failure to train claim under the Eighth Amendment. However, as discussed above, pretrial detainees' rights arise under the Fourteenth, not the Eighth, Amendment. *Hare*, 74 F.3d at 639.

[201] Rec. Doc. 41 at 23.

[202] *Id.* at 23–24.

[203] *Westfall v. Luna*, 903 F.3d 534, 552 (5th Cir. 2018).

[204] *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 170 (5th Cir. 2010).

tendencies does not rise to the level of a constitutional violation."[205] Here, Plaintiffs have alleged facts sufficient at this stage of litigation to show that CHJ failed to "properly train[] any of their medical staff to conduct mental health intake interviews at the jail" and that CHJ allowed "social workers and untrained employees . . . to perform tasks that should only be delegated to trained medical personnel."[206] Plaintiffs claim that this lack of training led to unqualified staff assessing inmates, including Guillot.[207] Specifically, Plaintiffs allege that Guillot, despite exhibiting obvious signs of mental health issues, was never placed on suicide watch, was never interviewed by trained medical personnel, and "none of the intake personnel who assisted in Marshall Guillot's health or mental health screening possessed the proper licensure, certification, and qualifications necessary to make an accurate determination of his mental health needs."[208]

Plaintiffs have further alleged that CHJ was deliberately indifferent in adopting its inadequate training policy, and that such inadequate policy directly caused the violation of Guillot's Fourteenth Amendment rights. Proving deliberate indifference "generally requires a showing of more than a single instance of the lack of training or supervision causing a violation of constitutional rights."[209] Instead, a plaintiff generally must show "'at least a pattern of similar violations' arising from training that is so clearly inadequate as to be obviously likely to result in

---

[205] *Whitt v. Stephens Cnty.*, 529 F.3d 278, 284 (5th Cir. 2008) (emphasis in original).

[206] Rec. Doc. 41 at 17–18.

[207] *Id.* at 18.

[208] *Id.*

[209] *Burge v. St. Tammany Par.*, 336 F.3d 363, 370 (5th Cir. 2003) (quoting *Thompson v. Upshur County*, 245 F.3d 447, 459 (5th Cir. 2001)) (internal quotation marks omitted).

a constitutional violation."[210] As described above, Plaintiffs have pointed to similar instances in which CHJ permitted unqualified staff to make medical decisions, including in the three prior suicides at JPCC in 2017.[211] Plaintiffs have further alleged that this inadequate policy led to CHJ's violation of Guillot's constitutional right to adequate medical care. Therefore, given that Plaintiffs have stated a claim for CHJ's failure to train, the Court denies the instant motion to dismiss with respect to Plaintiffs' failure to train claim.

### V. Conclusion

Based on the foregoing,

**IT IS HEREBY ORDERED** that CorrectHealth Jefferson, LLC and Ironshore Specialty Insurance Co.'s "Motion to Dismiss Plaintiffs' Amended Complaint"[212] is **DENIED**.

**NEW ORLEANS, LOUISIANA,** this 18th day of November, 2021.

_____
**NANNETTE JOLIVETTE BROWN**
**CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**

---

[210] *Id.*

[211] Rec. Doc. 41 at 18. The Fifth Circuit has held that a narrow single-incident exception exists but "only where the facts giving rise to the violation are such that it should have been apparent to the policymaker that a constitutional violation was the highly predictable consequence of a particular policy or failure to train." *Westfall*, 903 F.3d at 552 (citing *Burge*, 336 F.3d at 373) (internal quotation marks omitted). Given that Plaintiffs have provided facts in support of a pattern of violations, the Court will not analyze Plaintiffs' claims under the narrow single-incident exception.

[212] Rec. Doc. 46.