## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**DALTON GUILLOT, at al.**                                    **CIVIL ACTION**

**VERSUS**                                                   **NO. 20-1604**

**JEFFERSON PARISH SHERIFF**                                 **SECTION: "G"(3)**
**JOSEPH P. LOPINTO, III, et al.**

## <u>ORDER AND REASONS</u>

Plaintiffs Dalton Guillot, Destiny Guillot, Evan Mauer, and Lindsey Margiotta on behalf of minor children L.G. and R.G. (collectively, "Plaintiffs") brought this litigation against Defendants Jefferson Parish Sheriff Joseph P. Lopinto, III ("Lopinto"), CorrectHealth Jefferson, LLC ("CHJ"), and Ironshore Specialty Insurance Co. ("Ironshore) (collectively, "Defendants") after their father, Marshall Guillot, committed suicide while in custody at the Jefferson Parish Correctional Center ("JPCC").[1] Before the Court is Lopinto's Motion for Summary Judgment.[2] Plaintiffs oppose the motion.[3] Having considered the motion, the memoranda in support and in opposition, the record, and the applicable law, the Court grants the motion in part and denies it in part.

---

[1] Rec. Doc. 1; Rec. Doc. 41.

[2] Rec. Doc. 52.

[3] Rec. Doc. 74.

1

## I. Background

On June 3, 2020, Plaintiffs filed a complaint in this Court.[4] Plaintiffs named Sheriff Lopinto (the Sheriff of Jefferson Parish), CHJ (a limited liability company that provides medical services to inmates of the Jefferson Parish Correctional Center), and Ironshore (a limited liability company that issued a liability insurance policy to CHJ) as defendants.[5] On July 31, 2020, CHJ filed a motion to dismiss.[6] On August 21, 2020, Ironshore filed a motion to dismiss.[7] On March 31, 2021, the Court denied the motions to dismiss without prejudice.[8] The Court found that Plaintiffs had failed to state claims against CHJ and Ironshore for (i) inadequate medical care in violation of the Fourteenth Amendment and (ii) intentional infliction of emotional distress.[9] The Court granted Plaintiffs leave to amend the complaint to address these deficiencies, if possible.[10] On March 29, 2021, Plaintiffs filed an amended complaint.[11]

In the Amended Complaint, Plaintiffs allege that their father, Marshall Guillot ("Guillot"), was arrested on May 26, 2019, and charged in the 24th Judicial District Court for the Parish of Jefferson with unauthorized entry of an inhabited dwelling, home invasion, intimidating a witness, domestic abuse battery, misdemeanor theft, misdemeanor criminal neglect of family, felony theft,

---

[4] Rec. Doc. 1.

[5] *Id*. at 3–4.

[6] Rec. Doc. 11.

[7] Rec. Doc. 17.

[8] Rec. Doc. 37.

[9] *Id.*

[10] *Id.*

[11] Rec. Doc. 41.

and misdemeanor disturbing the peace.[12] According to the Amended Complaint, Guillot asserted that he was innocent of all charges and was being framed by his girlfriend.[13] Plaintiffs claim that Guillot had an initial hearing on May 31, 2019, where his bail was set at $120,500.[14] After the initial hearing, Guillot was taken to the Jefferson Parish Correctional Center ("JPCC").[15] Plaintiffs contend that Guillot was "very upset and crying" during this time.[16]

Plaintiffs allege that Guillot was involved in a fight with another inmate on June 3, 2019.[17] Plaintiffs claim that "[i]n spite of multiple employees acknowledging the urgency of the situation," Guillot was medically cleared to be put into isolated housing.[18] Plaintiffs claim that Guillot was put into isolated housing on June 4, 2019.[19] Plaintiffs allege that the next day, June 5, 2019, Guillot committed suicide by "hang[ing] himself from the window grate in his private cell, using a bed sheet."[20]

In the instant suit, Plaintiffs claim that Defendants failed to "properly assess [Guillot] as a suicide risk, or even a potential risk, in spite of the fact that he presented at the jail informing them of prior hospitalization for psychiatric needs, and a diagnosis of anxiety, major depression, and

---

[12] *Id.* at 4.

[13] *Id.*

[14] *Id.* at 4–5.

[15] *Id.* at 5.

[16] *Id.*

[17] *Id.* at 6.

[18] *Id.*

[19] *Id.*

[20] *Id.*

Post Traumatic Stress Disorder (PTSD)."[21] Plaintiffs allege that Defendants "exhibited a wanton and reckless disregard for Mr. Guillot's safety by placing him in a private cell without a cell mate, and doing nothing to prevent his suicide."[22] Plaintiffs assert that Defendants knew that Guillot was displaying "despair/hopelessness, great concern regarding 'what will happen to [him],' verbalization of a suicide plan, extreme restlessness exhibited by such behavior as continuous pacing, depressed state indicated by crying or insomnia, and concerns over events with significant others," yet Defendants still "failed to classify him as an actively suicidal inmate."[23] Additionally, according to the Amended Complaint, Guillot made several calls to his mother while detained at JPCC.[24] During one of the recorded phone calls, Plaintiffs allege that Guillot told his mother he was having suicidal thoughts.[25]

Moreover, Plaintiffs allege that Defendants were on notice of the possibility of inmates committing suicide in isolated housing because three other inmates, Jerome Bell, Josh Belcher, and Jatory Evans, had previously committed suicide in the same manner as Guillot in solitary cells at JPCC between August and September 2017.[26] Plaintiffs allege that following the three suicides, Sheriff Lopinto "instituted an evaluation of the jail policies and procedures" and "requested an internal evaluation," which found that it was possible to change the makeup of the bars in the cells

---

[21] *Id.* at 2.

[22] *Id.*

[23] *Id.* at 7–9, 11.

[24] *Id.* at 7.

[25] *Id.*

[26] *Id.*

to limit future suicide attempts.[27] Plaintiffs allege that despite the numerous suicides and despite being advised to alter the window bars in the solitary cells, Defendants failed to replace the window grates in the cells, failed to "monitor[] prisoners who are an obvious suicide risk," and "made a choice to place a prisoner who is clearly a self-proclaimed suicide risk in an area of the prison where it is difficult for Defendants and their employees to see inside the cells."[28]

Plaintiffs further claim that Lopinto has "a policy of not monitoring prisoners who are an obvious suicide risk."[29] Plaintiffs assert that Lopinto "made a choice to place a prisoner who is clearly a self-proclaimed suicide risk in an area of the prison where it is difficult for Defendants and their employees to see inside the cells."[30] Plaintiffs claim that Defendants have "implemented a policy of "placing prisoners who are a suicide risk in an area of the prison that makes it difficult to prevent prisoners from committing suicide."[31] Additionally, Plaintiffs assert that Defendants "have a policy of not adequately monitoring prisoners who are a suicide risk" as they have a policy of placing such prisoners in cells alone, rather than with another detainee.[32]

In the Amended Complaint, Plaintiffs bring two claims under 42 U.S.C. § 1983, alleging that: (1) Defendants failed to manage, train, and supervise their staff and medical personnel at the jail in violation of the Eighth and Fourteenth Amendments and (2) Defendants deprived Guillot of

---

[27] *Id.* at 10 (internal quotation marks omitted).

[28] *Id.* at 7–11.

[29] *Id.* at 9.

[30] *Id.*

[31] *Id.*

[32] *Id.*

adequate medical care in violation of the Fourteenth Amendment.[33] Plaintiffs do not bring an intentional infliction of emotional distress claim in the Amended Complaint.

On May 25, 2021, Lopinto filed the instant motion for summary judgment.[34] On January 4, 2022, Plaintiffs filed an opposition.[35] On January 20, 2022, with leave of Court, Lopinto filed a reply in further support of the motion for summary judgment.[36]

## II. Parties' Arguments

### A. *Lopinto's Arguments in Support of the Motion for Summary Judgment*

Lopinto makes various arguments in support of the instant motion. First, he argues that he is entitled to summary judgment on Plaintiffs' Eighth Amendment claim because Guillot was a pre-trial detainee, and thus the claims are governed by the Fourteenth Amendment rather than the Eighth Amendment.[37] Next, he argues that the Fourteenth Amendment claims against him in his individual capacity should be dismissed because Plaintiffs have not alleged, nor demonstrated with evidence, that Lopinto himself participated in any of the alleged conduct.[38]

As to Plaintiffs' official capacity claims, Lopinto argues that Plaintiffs cannot demonstrate that Guillot's constitutional rights were violated, nor that a municipal policy was the moving force behind any such violation.[39] First, Lopinto argues that there was no constitutional violation

---

[33] *Id.* at 23–24.

[34] Rec. Doc. 52.

[35] Rec. Doc. 77.

[36] Rec. Doc. 85.

[37] Rec. Doc. 52–1 at 12.

[38] *Id.* at 13–14.

[39] *Id.* at 21.

because no JPSO employees knew that Guillot was suicidal.[40] Lopinto contends that Guillot received "constant attention," and that "at no point in the days preceding his dead did **anyone**…ever report any concerns to the JPCC or CorrectHealth that Guillot was expressing suicidal thoughts."[41] Therefore, Lopinto contends that Plaintiffs cannot demonstrate that Guillot's constitutional rights were violated.[42]

Even if Guillot's constitutional rights were violated, Lopinto argues that he is entitled to summary judgment because any such violation was not the result of an official policy or custom.[43] Lopinto argues that "Plaintiffs do not identify any generally applicable statement of policy promulgated by the Sheriff," nor do they "allege or show any pattern of unconstitutional conduct similar to the conduct alleged in this case."[44] Lopinto contends that even if there was such a policy, Plaintiffs have not demonstrated that the policy was the cause of Guillot's suicide.[45]

## B.    *Plaintiffs' Arguments in Opposition to the Motion for Summary Judgment*

In opposition, Plaintiffs assert that multiple JPSO employees knew or should have known that Guillot was at risk for suicide.[46] Plaintiffs point to evidence in the record showing that JPSO employees knew that Guillot had been in a fight with another inmate and that he had been

---

[40] *Id.*

[41] *Id.*

[42] *Id.*

[43] *Id.* at 23.

[44] *Id.*

[45] *Id.*

[46] Rec. Doc. 77 at 8.

scheduled for a mental health evaluation.[47] Furthermore, Plaintiffs note that JPSO learned when Guillot first arrived that he had been diagnosed for PTSD, depression, and anxiety.[48] Additionally, Plaintiffs contend that JPSO staff was aware of Guillot's domestic problems, and that he was facing charges of domestic abuse and child neglect.[49] Plaintiffs contend that these charges show that Guillot was "suffering from humiliation and possible removal of parental rights," which Plaintiffs contend are "signs to look for to determine suicide risk."[50]

Plaintiffs argue that JPSO employees acted with deliberate indifference to inmate safety by continuing to place "inmates in the cells that the JPSO employees had previously identified as containing tools used for self-harm."[51] Plaintiffs note that three other inmates—Jerome Bell, Joshua Belcher, and Jatory Evans— committed suicide in similar ways.[52] Plaintiffs offer evidence that, after the third suicide, JPSO employees evaluated the window coverings from which the inmates hung themselves and determined that they should be replaced to prevent their use in further suicides.[53] Nevertheless, Plaintiffs contend that these window coverings were not replaced prior to Guillot's suicide.[54] Thus, Plaintiffs contend that JPSO acted with deliberate indifference to

---

[47] *Id.*

[48] *Id.*

[49] *Id.*

[50] *Id.* at 9.

[51] *Id.* at 10.

[52] *Id.*

[53] *Id.* at 12.

[54] *Id.*

Guillot's risk of suicide by placing him in a cell where JPSO employees knew that inmates could commit suicide.[55]

Plaintiffs make various arguments regarding a JPSO policy or custom that caused the constitutional violation. First, Plaintiffs argue that they "will meet their burden at trial to prove that [a] consistent failure of JPSO to communicate with CHJ with regard to urgent mental health concerns was an ongoing, unspoken policy that caused the deaths of Evans, Belcher, Bell, and Guillot."[56] Plaintiffs point to deposition testimony of Chief Deputy Sue Ellen Monfra, who testified that if an inmate was deemed a suicide risk, they would be placed in the infirmary on suicide watch rather than in administrative segregation.[57] Plaintiffs further notes that she testified that JPSO would "confer with medical" if an inmate was showing signs of "getting withdrawn" or "possibly depressed."[58] Nevertheless, Plaintiffs assert that this "simply did not happen in Marshall Guillot's case."[59]

Second, Plaintiffs argue that JPSO "violated their own policy by knowingly placing an inmate in a cell with a known tool used for self-harm,"[60] and cites the attached JPSO Suicide Prevention Policy.[61] Plaintiffs contend that JPSO failed to replace the metal grates covering the

---

[55] *Id.*

[56] *Id.* at 10.

[57] *Id.* at 9.

[58] *Id.*

[59] *Id.*

[60] *Id.* at 13.

[61] *Id.*

windows that Guillot and others used to commit suicide.[62] Plaintiffs further assert that JPSO: (1) failed to identify the circumstances of Mr. Guillot's confinement as precipitating risk factors for suicide; (2) failed to monitor and review the telephone conversation with his mother where he stated he was going to hang himself; (3) failed to review his "high priority" referral to mental health services in order to "gain a more complete assessment of his mental health status prior to placing him in administrative segregation"; (4) failed to ensure or inquire as to whether Guillot was receiving his medication as prescribed; and (5) failed to place Guillot on suicide watch. [63]

## C.   *Lopinto's Arguments in Further Support of the Motion*

In reply, Lopinto contends that Plaintiffs have not shown that he or any JPSO employee "knew or had any reason to believe that Guillot was at risk of suicide, let alone that they intentionally ignored the risk."[64] Lopinto further asserts that the only person who knew that Guillot was suicidal was his mother, "who did not report it to the Sheriff, or anyone – ever."[65]

Lopinto highlights that the pre-booking form that Plaintiffs' rely on notes that Guillot told JPCC staff "that he had no acute injury or mental illness at the time of booking."[66] Lopinto highlights the JPSO memo about Guillot's altercation with another inmate.[67] Lopinto points out that the memo states that Guillot was scheduled for a mental health evaluation "at staff request,"

---

[62] *Id.*

[63] *Id.*

[64] Rec. Doc. 85 at 2.

[65] *Id.*

[66] *Id.* at 3.

[67] *Id.*

and that Guillot was immediately examined by a nurse.[68] Lopinto further points out that the transfer of Guillot to administrative segregation "for [his] safety" was "in compliance with JPCC Policy."[69]

Lopinto also re-argues that Plaintiffs have not showed that an official policy caused Guillot's suicide. Lopinto argues that "Plaintiffs concede that the Sheriff had a [suicide prevention] policy," and that Plaintiffs "do not allege… that the policy … is unconstitutional on its face."[70] Lopinto contends that Plaintiffs' allegations that JPSO employees failed to follow the policy "sounds in negligence," and is thus insufficient to succeed on a 1983 claim.[71]

### III. Legal Standards

#### A.    *Legal Standard on a Motion for Summary Judgment*

Summary judgment is appropriate when the pleadings, discovery, and affidavits demonstrate "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[72] To decide whether a genuine dispute as to any material fact exists, the court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence."[73] All reasonable inferences are drawn in favor of the nonmoving party.[74] Yet "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and

---

[68] *Id.*

[69] *Id.*

[70] *Id.* at 6.

[71] *Id.* at 5.

[72] Fed. R. Civ. P. 56(a); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

[73] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398–99 (5th Cir. 2008).

[74] *Turner v. Baylor Richardson Medical Center*, 476 F.3d 337, 343 (5th Cir. 2007) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000))

conclusions of law' are insufficient to either support or defeat a motion for summary judgment."[75] If the entire record "could not lead a rational trier of fact to find for the non-moving party," then no genuine issue of fact exists and, consequently, the moving party is entitled to judgment as a matter of law.[76] The nonmoving party may not rest upon the pleadings.[77] Instead, the nonmoving party must identify specific facts in the record and articulate the precise manner in which that evidence establishes a genuine issue for trial.[78]

The party seeking summary judgment always bears the initial responsibility of showing the basis for its motion and identifying record evidence that demonstrates the absence of a genuine issue of material fact.[79] "To satisfy this burden, the movant may either (1) submit evidentiary documents that negate the existence of some material element of the opponent's claim or defense, or (2) if the crucial issue is one on which the opponent will bear the ultimate burden of proof at trial, demonstrate that the evidence in the record insufficiently supports an essential element of the opponent's claim or defense."[80] If the moving party satisfies its initial burden, the burden shifts to the nonmoving party to "identify specific evidence in the record, and to articulate" precisely how that evidence supports the nonmoving party's claims.[81] The nonmoving party must set forth

---

[75] *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985); *Little*, 37 F.3d at 1075.

[76] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

[77] *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

[78] *See id.*; *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

[79] *Celotex*, 477 U.S. at 323.

[80] *Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 190 (5th Cir. 1991) (quoting *Little*, 939 F.2d at 1299).

[81] *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994), *cert. denied*, 513 U.S. 871 (1994); *see also Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998).

"specific facts showing the existence of a 'genuine' issue concerning every essential component of its case."[82]

The nonmovant's burden of demonstrating a genuine issue of material fact is not satisfied merely by creating "some metaphysical doubt as to the material facts," "by conclusory allegations," by "unsubstantiated assertions," or "by only a scintilla of evidence."[83] Moreover, the nonmoving party may not rest upon mere allegations or denials in its pleadings.[84]

**B.    *Liability Under 42 U.S.C. § 1983***

42 U.S.C. § 1983 provides that every "person" who, under color of any statute, ordinance, regulation, custom, or usage of any State subjects, or "causes to be subjected," any person to the deprivation of any federally protected rights, privileges, or immunities shall be civilly liable to the injured party. "Section 1983 provides a cause of action against any person who deprives an individual of federally guaranteed rights 'under color' of state law."[85] "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'"[86]

The Supreme Court has held that municipal entities are "persons" under the definition of § 1983.[87] Furthermore, when a state official is sued in their official capacity, it is treated "as a suit

---

[82] *Morris*, 144 F.3d at 380; *see also Bellard v. Gautreaux*, 675 F.3d 454, 460 (5th Cir. 2012).

[83] *Little*, 37 F.3d at 1075 (internal citations omitted).

[84] *Morris*, 144 F.3d at 380.

[85] *Filarsky v. Delia*, 566 U.S. 377, 383 (2012) (quoting 42 U.S.C. § 1983).

[86] *West v. Atkins*, 487 U.S. 42, 49 (1988) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)).

[87] *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 810 (1985).

against the entity."[88] A supervisory official, however, may not be held liable under Section 1983 based upon a theory of vicarious liability or *respondeat superior*.[89] Instead, a plaintiff must allege both (i) "that a constitutional violation occurred" and (ii) "that a municipal policy was the moving force behind the violation."[90] Under the latter, a plaintiff must show three things: (1) an "official policy or custom 'was a cause in fact of the deprivation of rights inflicted,'[91] (2) the policy "served as a moving force" behind the constitutional violation, [92] and (3) the policy was decided on by a policymaker with "either actual or constructive knowledge of the alleged policy."[93]

To satisfy the first requirement, the Supreme Court, in *Monell v. Department of Social Services of New York*, set out the possible methods of showing a policy or custom: "(1) [an] express policy of violating the Constitution, (2) a widespread practice or custom—even if that custom has not received formal approval by an official decision-making body—or (3) a decision by an individual with express policy-making authority."[94] Under Fifth Circuit precedent, a custom may be evidenced by "a persistent, widespread practice of officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to

---

[88] *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).

[89] *Green v. Albertson's, Inc.*, 67 F. App'x 248, at *2, n.3 (citing *Monell*, 436 U.S. at 691).

[90] *Sanchez v. Young Cnty., Texas*, 956 F.3d 785, 791 (5th Cir.), *cert. denied,* 141 S. Ct. 901, 208 L. Ed. 2d 455 (2020).

[91] *Spiller v. City of Texas City, Police Dept.*, 130 F.3d 162, 167 (5th Cir. 1997) (quoting *Leffall v. Dallas Indep. Sch. Dist.*, 28 F.3d 521, 525 (5th Cir. 1994)).

[92] *Id.* (internal citations and quotation marks omitted).

[93] *Cox v. City of Dallas*, 430 F.3d 734, 748–49 (5th Cir. 2005) (citing *Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001)).

[94] *Cardenas v. Lee Cnty., Tex.*, 569 F. App'x 252, 255 (5th Cir. 2014) (citing *Monell,* 436 U.S. at 690–91).

constitute a custom that fairly represents the municipality's policy."[95] To render a municipality liable for such a custom, "actual or constructive knowledge" of the custom must be "attributable to the governing body or officials to whom that body has delegated policy-making authority,"[96] meaning that the actions "must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of city employees."[97] "Isolated unconstitutional actions by employees will almost never trigger liability."[98]

## IV. Analysis

The Complaint asserts a § 1983 claim against all Defendants under the Fourteenth Amendment and Eighth Amendment for "deliberate[] indifferen[ce] in managing, training, and supervising their subordinates and medical personnel that interacted with Marshall Guillot" (count one).[99] The Complaint also asserts a § 1983 claim against all Defendants under the Fourteenth Amendment for "failure to provide adequate medical care" (count two).[100] Lopinto appears to argue that he is entitled to summary judgment on all of these claims. The Court will address the inadequate medical care claim before turning to the failure to train claim.

---

[95] *Piotrowski*, 237 F.3d at 579 (quoting *Webster v. City of Houston*, 735 F.2d 838, 842 (5th Cir. 1984) (en banc)).

[96] *Webster*, 735 F.2d at 841.

[97] *Id.* at 842.

[98] *Piotrowski*, 237 F.3d at 579.

[99] Rec. Doc. 41. at 23.

[100] *Id.* at 24.

15

### A.    *Inadequate Medical Care*

#### 1.  Individual Capacity

 "Well settled Section 1983 jurisprudence establishes that supervisory officials cannot be held vicariously liable for their subordinates' actions."[101] Instead, supervisory officials may only be held liable if "(i) they affirmatively participate in acts that cause constitutional deprivation; or (ii) implement unconstitutional policies that causally result in plaintiff's injury."[102] Plaintiffs have not presented evidence, nor have they attempted to argue in opposition to this motion, that Lopinto was personally involved in the circumstances surrounding Guillot's suicide. Nor have Plaintiffs presented evidence, or attempted to argue, that Lopinto was personally involved in the pattern, discussed later in this opinion, of placing detainees in cells known to be dangerous. In fact, the evidence demonstrates that the prior suicides Plaintiffs cite to establish a pattern occurred during the tenure of Lopinto's predecessor.[103] As a result, any claims against Lopinto in his individual capacity must be dismissed.

#### 2.  Official Capacity

The Due Process Clause of the Fourteenth Amendment guarantees a pretrial detainee's rights to medical care and protection from known suicidal tendencies.[104] When attributing violations of these rights to municipalities or supervisory officials, "the cause of those violations is characterized either as a condition of confinement or as an episodic act or omission."[105] As the

---

[101] *Mouille v. City of Live Oak*, 977 F.2d 924, 929 (5th Cir. 1992).

[102] *Id.*

[103] Rec. Doc. 77–13.

[104] *Garza v. City of Donna*, 922 F.3d 626, 632 (5th Cir. 2019).

[105] *Id.*

Court noted in its November 18, 2021 Order denying CHJ and Ironshore's motion to dismiss, Plaintiffs' claim is properly characterized as an episodic act or omission claim.[106] To establish municipal liability in such a case, a plaintiff must show that (1) the municipal employee violated the pretrial detainee's clearly established constitutional rights with subjective deliberate indifference; and (2) that this violation resulted from a municipal policy or custom adopted and maintained with objective deliberate indifference.[107]

### a. Whether Lopinto Violated Guillot's Fourteenth Amendment Right to Medical Care

As discussed above, to state a claim for a violation of Guillot's Fourteenth Amendment rights, Plaintiffs must show subjective deliberate indifference. In *Hare v. City of Corinth*, the Fifth Circuit held that the Supreme Court's formulation of subjective deliberate indifference in *Farmer v. Brennan*, which was an Eighth Amendment case, "properly captures the essence of the inquiry as to whether a pretrial detainee has been deprived of his due process rights to medical care" under the Fourteenth Amendment.[108] As explained by the Supreme Court in *Farmer*, an official cannot be found liable "unless the official knows of and disregards an excessive risk to inmate safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."[109] "Deliberate indifference cannot be inferred from a prison official's mere failure to act reasonably,

---

[106] Rec. Doc. 71 at 25–26.

[107] *Id.*

[108] *Hare*, 74 F.3d at 649.

[109] *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

*i.e.*, it cannot be inferred from negligence alone."[110] "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."[111] "Suicide is an objectively serious harm implicating the state's duty to provide adequate medical care."[112]

To succeed on Plaintiffs' claim, they must demonstrate that Lopinto or JPSO (1) had subjective knowledge of a substantial risk of a serious harm and (2) responded to that risk with deliberate indifference.[113] Lopinto argues that he is entitled to summary judgment because he was not deliberately indifferent to any known risk to Guillot's safety. Lopinto argues that the "record makes clear that Guillot received near constant attention," and that "at no point in the days preceding his death did anyone … ever report any concerns to the JPCC or CorrectHealth that Guillot was expressing suicidal thoughts."[114] As a result, Lopinto argues that "the record is thus clear that no one, whether a named party or otherwise, was indifferent to a known risk that Guillot might commit suicide."[115]

The Court rejected similar arguments in the November 18, 2021 Order and Reasons denying CHJ and Ironshore's motion to dismiss.[116] That Order concerned whether Plaintiff had

---

[110] *Lawson*, 286 F.3d at 262–63.

[111] *Farmer*, 511 U.S. at 842.

[112] *Arenas v. Calhoun*, 922 F.3d 616, 621 (5th Cir. 2019).

[113] *Cope v. Cogdill*, 3 F.4th 198 (5th Cir. 2021)

[114] Rec. Doc. 52–1 at 21.

[115] *Id.*

[116] *See* Rec. Doc. 71.

sufficiently alleged that Defendants CHJ and Ironshore were deliberately indifferent toward Guillot's medical needs. Lopinto filed the instant motion prior to the November 18, 2021 Order, and "adopts [CHJ's]" in its briefing on that motion "in their entirety."[117] Nevertheless, the instant motion appears to make an additional argument that Lopinto is not responsible for the alleged deliberate indifference to Guillot's medical needs because CHJ, rather than Lopinto, "is the entity charged with the duty to provide constitutionally adequate medical care."[118] As a result, Lopinto argues that he is entitled to summary judgment on Plaintiffs' claims "arising out of Guillot's medical screening and treatment."[119]

Although the Court has already rejected the arguments that Lopinto incorporates from CHJ and Ironshore's motion to dismiss, the Court's prior Order does not resolve this issue. "[E]ach defendant's subjective deliberate indifference, [or lack thereof], must be examined separately."[120] Thus, the Court must determine whether there is sufficient evidence that Lopinto (1) had subjective knowledge of a substantial risk of a serious harm and (2) responded to that risk with deliberate indifference.[121]

To the extent that Lopinto argues that CHJ, rather than any JPSO employee, knew that Guillot was a suicide risk, Plaintiffs' point to various pieces of record evidence to demonstrate JPSO's knowledge. First, Plaintiffs' highlight a JPSO memo explaining that Guillot had been in a

---

[117] *Id.* at 7.

[118] *Id.* at 10

[119] *Id.*

[120] *Stewart v. Murphy*, 174 F.3d 530, 537 (5th Cir. 1999); *see also Tamez v. Manthley*, 589 F.3d 764, 770 (5th Cir. 2009).

[121] *Cope v. Cogdill*, 3 F.4th 198 (5th Cir. 2021).

fight with another inmate.[122] Plaintiffs also point to a JPSO memo noting that "[t]he housing unit stated that [Guillot] had been walking around being crazy and trying to start things," and that he was scheduled for a mental health evaluation.[123] Plaintiffs also attach a notice from the JPSO to Guillot, which states that "[u]pon further investigation it seems you were exhibiting strange behavior on the housing unit and making the other inmates uncomfortable."[124] It further states that Guillot would be transferred to administrative segregation "for [his] safety and the safe operation of this facility."[125] Additionally, Plaintiffs point to the JPSO's "Pre-Booking Form," which notes that Lopinto had been diagnosed and treated for post-traumatic stress disorder and depression.[126]

As to whether Lopinto responded to that risk with deliberate indifference, Plaintiffs contend that JPSO put Guillot in a cell with the same layout as the cells where three other inmates previously committed suicide.[127] Plaintiffs' point to evidence that cell number 13, where Guillot was confined, was farthest from the observation room where JPSO officers observed inmates placed in administrative segregation.[128] Plaintiffs offer photographs showing that that "the line of sight from the observation desk does not allow view of the windows in the cell," from which Guillot and the three others hung themselves.[129]

---

[122] Rec. Doc. 77–5.

[123] Rec. Doc. 77–6.

[124] Rec. Doc. 77–7.

[125] *Id.*

[126] Rec. Doc. 77–2.

[127] Rec. Doc. 77 at 4.

[128] *Id.* at 11.

[129] Rec. Doc. 77–17 at 3.

Plaintiffs further point to a series of emails from 2017 demonstrating that JPSO was aware that multiple detainees committed suicide in the same manner in the same cells. One email from Major Edward Olsen, a Deputy Administrator of JPCC, states as follows:

> As you should be aware, there have been three suicide attempts within the Correctional Center within the last two months. All three attempts did result in the detainee's death at the hospital. All three cases were nearly identical in modus operandi; the inmate used a bedsheet or pieces of the sheet fashioned into a length sufficient to tie around the expanded metal covering the window and then around the neck.[130]

That email further notes that Chief Monfra requested an "evaluation" to determine whether other products can be used in place of the "expanded metal" in order to "limit the ability of an inmate to utilize the windows as a tool to harm themselves."[131]

Plaintiffs further offer evidence of an October 5, 2017 email discussing a plan to replace the window coverings of some of the cells.[132] The author of that email, a JPSO employee, requested an "emergency" purchase order to replace the window covering, and noted that it was "a security/safety issue which needs to be addressed immediately."[133] Nevertheless, the window grates were not replaced prior to Guillot's suicide more than a year and half later.[134] Plaintiffs also note that, at least as of December 9, 2021, the window coverings used in Jerome Bell and Joshua Belcher's suicides had also not been replaced.[135]

---

[130] Rec. Doc. 77–15 at 19.

[131] *Id.*

[132] Rec. Doc. 77–16 at 8.

[133] *Id.*

[134] Rec. Doc. 77–17 at 4, 5.

[135] *Id.* at 7, 12.

Plaintiffs' have presented compelling evidence that JPSO was aware that detainees could hang themselves from the window grates in the segregated cells, that JPSO contemplated replacing the window grates to prevent suicides, and yet nevertheless failed to do so for more than a year and a half while they continued to use the cells. This evidence would be more than enough for Plaintiffs to overcome their summary judgment burden if JPSO also knew that Guillot was at risk for suicide.[136] In other words, if JPSO and the Jefferson Parish Sherriff Joseph Lopinto knew that Guillot was at risk for suicide, a reasonable jury could find that Lopinto acted with deliberate indifference in placing him in a cell that Lopinto knew had the means for Guilliot to attempt suicide.[137]

However, whether the evidence is sufficient for a reasonable jury to find that Lopinto (or his employees) had "subjective knowledge" of Guillot's risk of suicide is a closer question. The Fifth Circuit has affirmed the denial of a motion for summary judgment where a jail official was aware that the inmate had a history of depression and suicide attempts, was told by his wife that that he was suicidal, and refrained from giving him a sheet, even though the inmate stated that he was "not presently considering suicide" and the officer stated that she did not consider him to be a suicide risk.[138] However, the Fifth Circuit has rejected a § 1983 claim where, although the inmate's "actions seem[ed] to have become increasingly erratic, nothing he did so clearly indicated an intent to harm himself that the deputies caring for him could have only concluded that he posed

---

[136] *Jacobs v. West Feliciana Sheriff's Dept*, 228 F.3d 388 (5th Cir. 2000) (finding that a jury could conclude that the Sheriff acted with deliberate indifference where the detainee was placed in a cell which had "a significant blind spot and tie-off points, despite the fact that during [the Sherriff's] tenure another detainee…had committed suicide in the same cell by hanging himself from one of the tie-off points.").

[137] *See id.*

[138] *Hyatt v. Thomas*, 843 F.3d 172 (5th Cir. 2016).

a serious risk of harm to himself."[139] That court has noted a "reluctance to hold that generalized evidence of an inmate's mental illness invariably indicates a substantial risk of self-harm."[140]

As discussed above, Plaintiffs rely on the following pieces of evidence in the record to establish JPSO and Sheriff Lopinto's knowledge of Guillot's risk of suicide: (1) a JPSO memo explaining that Guillot had been in a fight with another inmate; (2) a JPSO memo noting that Guillot was "being crazy and trying to start things" and that Guillot was scheduled for a mental health evaluation; (3) a notice from JPSO to Guillot stating that he was "exhibiting strange behavior" that made "other inmates uncomfortable," and would be transferred to administrative segregation "for [his] safety and the safe operation of this facility"; and (4) the JPSO "Pre-Booking Form," which notes that Guillot had been diagnosed and treated for post-traumatic stress disorder and depression. Thus, Plaintiff does not rely merely on "generalized evidence of [Guillot's] mental illness."[141] That Guillot was acting erratically such that JPSO transferred him to administrative segregation "for [his] safety and the safe operation of th[e] facility" is compelling evidence toward Lopinto's knowledge of Guillot's risk of suicide. Additionally, Plaintiffs present evidence establishing that Guillot made a phone call from the jail where he made the following three statements to his mother: (1) "I am going to f***ing hang myself"; (2) "I'm going to kill myself in this b**ch."; (3) "Y'all are going to make me hang myself."[142] However, Lopinto offers an affidavit of Lieutenant Chris Morris, which states that although all calls are recorded, Guillot's

---

[139] *Sibley v. Lemaire*, 184 F.3d 481, 489 (5th Cir. 1999).

[140] *Estate of Bonilla v. Orange County*, 982 F.3d 298, 306 (5th Cir. 2020).

[141] *Bonilla*, 982 F.3d at 306.

[142] Rec. Doc. 77–20.

calls were not being monitored.[143] Furthermore,  there is no evidence the Lopinto was aware of any prior suicide attempts by Guillot.

The issue of "[w]hat a prison official subjectively knew 'is a question of fact subject to demonstration in the usual ways, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."[144] On a motion for summary judgment, of course, the Court must construe the evidence in the light most favorable to the nonmoving party. Viewed in the light most favorable to Plaintiffs, the evidence is sufficient for a reasonable jury to conclude that JPSO knew that Guillot was suicidal. Specifically, there is evidence that he was behaving erratically, that he had a history of depression, PTSD, and anxiety, that JPSO officials put him in administrative segregation for his own safety, and that he stated on a recorded jail phone call that he intended to kill himself. Thus, Lopinto is not entitled to summary judgment on this basis.

> **b.** **Whether the violation resulted from a municipal policy or custom that was adopted and maintained with deliberate indifference**

As discussed, in addition to JPSO employee's violating Guillot's constitutional rights, to hold Lopinto liable in his official capacity Plaintiffs must also demonstrate that this violation resulted from a municipal policy or custom adopted and maintained with objective deliberate indifference.[145] To make this showing, Plaintiffs must demonstrate that (1) an "official policy or custom 'was a cause in fact of the deprivation of rights inflicted,'[146] (2) the policy "served as a

---

[143] Rec. Doc. 52–3 at 2.

[144] *Farmer*, 511 U.S. at 842.

[145] *Id.*

[146] *Spiller v. City of Texas City, Police Dept.*, 130 F.3d 162, 167 (5th Cir. 1997) (quoting *Leffall v. Dallas*

moving force" behind the constitutional violation,[147] and (3) the policy was decided on by a policymaker with "either actual or constructive knowledge of the alleged policy."[148]

To identify an official policy or custom, a plaintiff can show either: (1) an express policy of violating the Constitution; (2) a widespread practice or custom, even if that custom has not received formal approval by an official decision-making body; or (3) a decision by an individual with express policy-making authority.[149] Under Fifth Circuit precedent, a custom may be evidenced by "a persistent, widespread practice of officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents the municipality's policy."[150] To hold a municipality liable for such a custom, "actual or constructive knowledge" of the custom must be "attributable to the governing body or officials to whom that body has delegated policy-making authority,"[151] meaning that the actions "must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of city employees."[152]

---

*Indep. Sch. Dist.*, 28 F.3d 521, 525 (5th Cir. 1994)).

[147] *Id.* (internal citations and quotation marks omitted).

[148] *Cox v. City of Dallas*, 430 F.3d 734, 748–49 (5th Cir. 2005) (citing *Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001)).

[149] *Cardenas v. Lee Cnty., Tex.*, 569 F. App'x 252, 255 (5th Cir. 2014) (citing *Monell,* 436 U.S. at 690–91).

[150] *Piotrowski*, 237 F.3d at 579 (quoting *Webster v. City of Houston,* 735 F.2d 838, 842 (5th Cir. 1984) (en banc)).

[151] *Webster*, 735 F.2d at 841.

[152] *Id.* at 842.

Although Plaintiffs alleged several policies or customs in the Amended Complaint, it is unclear from Plaintiffs' opposition what policies or customs they are relying on to oppose Lopinto's motion for summary judgment. Lopinto argues that Plaintiffs "do not identify any generally applicable statement of policy promulgated by the Sheriff."[153] Further, Lopinto contends that "Plaintiffs do not allege or show any pattern of unconstitutional conduct similar to the conduct alleged in this case."[154] Alternatively, "even assuming such a policy did exist," Lopinto contends that Plaintiffs have not presented evidence that the policy was the cause of Guillot's suicide.[155] Plaintiffs appear to make three arguments in response. First, Plaintiffs assert that the "consistent failure of JPSO to communicate with CHJ with regard to urgent mental health concerns was an ongoing, unspoken policy that caused the deaths of Evans, Belcher, Bell and Guillot."[156] Second, Plaintiffs assert that JPSO violated its own Suicide Prevention policy.[157] Third, Plaintiffs appear to argue that JPSO has a custom of placing detainees who are at risk of suicide in segregated cells with window grates that JPSO knows detainees can hang themselves from. The Court will address each argument in turn.

As mentioned above, Plaintiffs argue that JPSO has an "ongoing, unspoken policy" of not communicating mental health concerns to CHJ. Plaintiffs point to the deposition testimony of Sue Ellen Monfra, who is the Chief Deputy at JPCC. Plaintiffs note that she testified as follows:

> [I]f we have an inmate whose behavior could be indicative of maybe getting withdrawn, possibly depressed, or just not interacting and the officer notes that

---

[153] Rec. Doc. 52–1 at 23.

[154] *Id.*

[155] *Id.*

[156] Rec. Doc. 77 at 10.

[157] *Id.*

something else is different about their demeanor, we would, or we could, call the medical to come evaluate them, have them come speak to them and make a determination.

It could be a notice from the officer in the inmate's behavior that would indicate a concern and possibly need an evaluation by medical.

Despite this procedure, Plaintiffs assert that this "simply did not happen in Marshall Guillot's case."[158] Plaintiffs suggest that there is no documentation that JPSO contacted CHJ about Guillot.[159] However, Plaintiffs do not point to any evidence suggesting that JPSO has a policy or custom of not communicating with CHJ. The Court acknowledges that a policy or custom for purposes of liability under § 1983 need not be "authorized by officially adopted and promulgated policy," and instead may be established by "a persistent, widespread practice … [that] is so common and well settled as to constitute a custom that fairly represents municipal policy."[160] However, Plaintiffs present no *evidence* of such a practice, and instead assert that the described procedure "did not happen in Marshall Guillot's case."[161]

Although Plaintiffs do state that they "will meet their burden at trial to prove that this consistent failure of JPSO to communicate with CHJ with regard to urgent mental health concerns was an ongoing, unspoken policy,"[162] Plaintiffs do not offer any evidence of such a policy at the summary judgment stage. A party opposing a motion for summary judgment "may not rest upon

---

[158] *Id.* at 9.

[159] *Id.* at 10.

[160] *Piotrowski*, 237 F.3d at 579.

[161] Rec. Doc. 77 at 10.

[162] *Id.*

the mere allegations or denials of its pleadings."[163] The nonmovant has the burden to "identify specific evidence in the summary judgment record."[164] However, "only evidence—not argument, not facts in the complaint—will satisfy the burden."[165] Because Plaintiffs have not offered any evidence of a policy or custom that JPSO fails to communicate with CHJ, this alleged policy is insufficient to defeat summary judgment.

Plaintiffs also appear to argue that JPSO "violated its own policy by placing an inmate who was clearly exhibiting signs of mental distress into a segregated cell with a known tool used for self-harm by suicidal inmates."[166] Plaintiffs appear to be suggesting that JPSO violated its Suicide Prevention Policy, which Plaintiffs attach to their opposition. It is not clear from Plaintiffs' briefing exactly which provision of the policy Plaintiffs claim was violated. The Suicide Prevention Policy states that "[t]hose inmates determined to be a risk are placed in the respective medical area for housing," and that "[a]ny cell within the infirmary … is designed to hold an inmate … that has been placed on suicide watch."[167] However, it is not clear how this provision was violated, given that part of Plaintiff's claim is that Guillot *wasn't determined to be a suicide risk*, and thus was not required to be placed in cell within the infirmary.

Even assuming that the Suicide Prevention policy was in fact violated, however, Plaintiffs do not explain how this would be sufficient to establish municipal liability. Rather than offering a

---

[163] *Morris*, 144 F.3d at 380.

[164] *Forsyth*, 18 F.3d at 1533.

[165] *Johnston v. City of Houston*, 14 F.3d 1056, 1060 (5th Cir. 1994).

[166] Rec. Doc. 77 at 10.

[167] Rec. Doc. 7–8.

JPSO policy or custom that was the moving force behind the constitutional violation, Plaintiffs' argument is that JPSO acted *in violation* of an official policy.

The violation of a municipal policy or custom by itself, however, cannot be the basis for liability under *Monell*. The Fifth Circuit has explained that the "failure to follow procedural guidelines, standing alone, does not implicate constitutional liability."[168] The Fifth Circuit has noted that claims that "employees did not abide by the City's policies" are essentially *respondeat superior* claims that are "not cognizable under 1983."[169] In *Anderson v. Dallas County*, for example, the Fifth Circuit considered whether prison officials' failure to perform CPR on an inmate who attempted suicide could create municipal liability on the county.[170] Because the county had a policy that required jail officials to use "basic first aid procedures," and the jail official's failure to conduct CPR was in violation of that policy, the Court rejected the plaintiff's municipal liability claim.[171] Thus, any violation of the JPSO Suicide Prevention Policy is insufficient to establish a "custom or policy" for purposes of municipal liability, unless the violation of that policy is itself a persistent and widespread practice such that it "is so common and well settled as to constitute a custom that fairly represents municipal policy."[172] Plaintiffs have made no such showing here.

Lastly, Plaintiffs appear to assert that JPSO had a custom of "continued placement of inmates in the cells that JPSO employees had previously identified as containing tools used for

---

[168] *Evans v. City of Marlin*, 986 F.2d 104, 108 (5th Cir. 1993).

[169] *Young v. City of Houston*, 599 Fed. App'x 553 (5th Cir. 2015).

[170] *Anderson v. Dallas County*, 286 Fed. App'x 850, 862 (5th Cir. 2008).

[171] *Id.*

[172] *See Piotrowski*, 237 F.3d at 579 (quoting *Webster,* 735 F.2d at 842).

29

self-harm."[173] Plaintiffs offer evidence of the suicides of Jerome Bell on August 4, 2017 in cell

4BL12, Joshua Belcher on August 17, 2017 in cell 4AR3, and Jatory Evans on September 27, 2017

in cell 4DR12. Curiously, Lopinto states in his reply brief that he "will not address Plaintiffs'

reference to three previous suicides at JPCC as the Court [has] already found these instances to be

distinct from and irrelevant to this case."[174] Lopinto appears to be referencing the Court's March

1, 2021 Order denying CHJ and Ironshore's first motion to dismiss.[175] In that Order, responding

to Plaintiffs' argument that the three prior suicides showed a pattern or custom of CHJ

misclassifying suicidal inmates, the Court explained:

> [T]hese allegations suggest that the three inmates who previously committed
> suicide were classified as suicidal before their deaths, whereas in this case Plaintiffs
> contend that CHJ employees acted with deliberate indifference to Guillot's serious
> medical needs by failing to classify him as suicidal.

However, Plaintiffs' claim as to Lopinto differs. Plaintiffs' argument is that these three prior

suicides demonstrate a custom or pattern of JPSO placing suicidal inmates in cells that JPSO

employees knew could be used to commit suicide. Thus, the Court has not already rejected this

claim, as Lopinto seems to suggest.[176]

　　As discussed, a custom or policy can be shown by a "a persistent, widespread practice …

[that] is so common and well settled as to constitute a custom that fairly represents municipal

---

[173] Rec. Doc. 77 at 11.

[174] Rec. Doc. 84.

[175] Rec. Doc. 37 at 21.

[176] Indeed, the Court's November 18, 2021 Order and Reasons denying Defendants CHJ and Ironshore's second motion to dismiss ruled that the three prior suicides could be sufficient to show a pattern of CHJ delegating medical decisions to non-medical personnel, as alleged in the amended complaint. Rec. Doc. 71 at 31–32.

policy."[177] "A customary policy consists of actions that have occurred for so long and with such frequency that the course of conduct demonstrates the governing body's knowledge and acceptance of the disputed conduct."[178] A plaintiff must demonstrate "a pattern of abuses that transcends the error made in a single case."[179] Establishing a pattern "requires similarity and specificity; 'prior indications cannot simply be for any and all bad or unwise acts, but rather must point to the specific violation in question."[180] "A pattern also requires 'sufficiently numerous prior incidents' as opposed to 'isolated instances.'"[181]

It is undisputed that Guillot's suicide was performed in a substantially similar manner to the suicides of Joshua Belcher, Jatory Evans, and Jerome Bell. Plaintiffs' offer evidence suggesting that all three inmates hung themselves from the window grates in cells within the administrative segregation unit. Indeed, JPSO's own communications demonstrate that they understood the incidents to be substantially similar. A September 28, 2017 email from JPCC Deputy Administrator Major Edward Olsen states that "[a]ll three cases were nearly identical in modus operandi; the inmate used a bedsheet or pieces of the sheet fashioned into a length sufficient to tie around the expanded covering the window and then around the neck."[182] There can be no doubt that these incidents are sufficiently similar for purposes of establishing a de facto policy. Thus, the relevant inquiry is whether the conduct was sufficiently persistent.

---

[177] *Piotrowski*, 237 F.3d at 579.

[178] *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 168 (5th Cir. 2010).

[179] *Peterson v. City of Fort Worth*, 588 F.3d 838, 850-51 (quoting *Piotrowski*, 237 F.3d at 582).

[180] *Id.* (citation and quotation marks omitted).

[181] *Id.* (citation and quotation marks omitted).

[182] Rec. Doc. 77–15 at 19.

31

As discussed above, a de facto policy must be a "persistent, widespread practice of city officials or employees" that is "so common and well settled as to constitute a custom that fairly represents municipal policy."[183] The reason for this, of course, is to ensure that "a municipality cannot be held liable *solely* because it employs a tortfeasor."[184] Requiring a persistent, widespread practice ensures that a municipality is not held liable unless the injury is caused by the execution of a custom made by those "whose edicts or acts may fairly be said to represent official policy."[185] Repeated conduct is necessary to "demonstrate[s] the governing body's knowledge and acceptance of the disputed conduct."[186] Although similar, repetitive conduct is required in order to demonstrate the municipality's knowledge and acceptance of the conduct, the Fifth Circuit has often stated that it has "no rigid rule regarding numerosity to prove a widespread pattern of unconstitutional acts."[187]

Combined with the undisputed evidence that JPSO was aware of the multiple suicides and that these cells could be used for that purpose, the Court finds that three prior instances of suicidal detainees committing suicide in the administrative segregation cells, all within two months, are enough to establish the municipality's knowledge and acceptance of the danger. To be sure, the Fifth Circuit has affirmed summary judgment for a municipality based on a small number of prior suicides. In *Fuentes v. Nueces County*, the Fifth Circuit stated that "four incidents of inmate suicide—lacking in common characteristics—over a 20-year span were not sufficiently numerous

---

[183] *Piotrowski*, 237 F.3d at 579

[184] *Monell v. Dep't of Social Services of City of New York*, 436 U.S. 658, 690 (1978).

[185] *Id*. at 694.

[186] *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 168 (5th Cir. 2010).

[187] *Jackson v. Valdez*, 852 Fed. App'x 129, 135 (5th Cir. 2021).

to constitute a pattern."[188] However, that Court highlighted that those incidents "materially differ[ed]" from the plaintiff's case, and thus "lack[ed] the type of specific similarity" necessary to show a pattern.[189] Furthermore, those suicides occurred over two decades. Here, on the other hand, as discussed above, all four suicides were conducted in the same manner. Furthermore, each of these suicides occurred over the course of two years, rather than the twenty-year period in *Fuentes*.

The Fifth Circuit's cases suggest that whether a pattern exists depends on not only the number of instances, but also the nature of the conduct. In *Peterson v City of Fort Worth*, for example, the Fifth Circuit held that "[g]iven the [police] department's size, and absent any evidence of its total number of arrests during the same period, 27 incidents of excessive force over a period of four years do not reflect a pattern" under *Monell*.[190] Similarly, in *Pineda v. City of Houston*, the Fifth Circuit held that eleven instances of alleged unconstitutional searches "in one of the Nation's largest cities and police forces" could not support a pattern of illegality "because the sample of alleged unconstitutional events is just too small."[191] Thus, these cases suggest that the mere number of incidents must be viewed in context of the type and frequency of the disputed conduct. It is therefore unsurprising that 27 incidents of excessive force in *Peterson*, and 11 incidents of unconstitutional searches in *Pineda*, were insufficient to demonstrate a pattern given how frequently officers conduct searches and use force.

---

[188] *Fuentes v. Nueces County*, 689 F. App'x 775 (5th Cir. 2017).

[189] *Id.* at 778.

[190] *Peterson v. City of Fort Worth*, 588 F.3d 838 (5th Cir. 2009).

[191] *Pineda v. City of Houston*, 291 F.3d 3225, 329 (5th Cir. 2002).

Given that jail suicides are less common than police searches or uses of force, these cases do not compel the conclusion that the prior suicides are insufficient to establish a *de facto* custom. Plaintiff has provided evidence that all four of these suicides occurred in the same manner within a span of two years. As discussed above, Plaintiff has also provided evidence that JPSO was aware that window grates posed a risk to suicidal inmates, inquired into the possibility of replacing these grates, and then failed to do so for almost two years while continuing to place inmates in those cells. Again, on a motion for summary judgment the Court must view the evidence in the light most favorable to Guillot, as the non-moving party, and draw all reasonable inferences in his favor.[192] So construed, based on this evidence, the Court finds that a reasonable jury could find that Guillot's death resulted from a municipal policy or custom adopted and maintained with deliberate indifference.

## B.   *Failure to manage, train, and supervise claim*

The Amended Complaint also asserts a claim under the Fourteenth and Eighth Amendments that Lopinto was "grossly negligent, reckless, and deliberately indifferent in managing, training, and supervising their subordinates and medical personnel that interacted with Marshall Guillot."[193]

"It is well-established that a municipality's failure to train its [] officers can give rise to § 1983 liability."[194] To establish a failure to train claim, a plaintiff must show "(1) that the municipality's training procedures were inadequate, (2) that the municipality was deliberately

---

[192] *Turner v. Baylor Richardson Medical Center*, 476 F.3d 337, 343 (5th Cir. 2007) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000))

[193] Rec. Doc. 41 at 23–24.

[194] *Westfall v. Luna*, 903 F.3d 534, 552 (5th Cir. 2018).

indifferent in adopting its training policy, and (3) that the inadequate training policy directly caused the violations in question."[195]

To the extent that Plaintiffs bring a failure to train claim under the Eighth Amendment, Lopinto is entitled to summary judgment. Guillot was a pretrial detainee at the time of his confinement and death. The Fifth Circuit has explained that the "[p]retrial detainees and convicted prisoners … look to different constitutional provisions for their respective rights to basic needs."[196] "The constitutional rights of a convicted state prisoner spring from the Eighth Amendment's prohibition on cruel and unusual punishment," while the rights of pretrial detainees "flow from both the procedural and substantive due process guarantees of the Fourteenth Amendment."[197] Because Guillot was a pretrial detainee, Plaintiffs' claims under the Eighth Amendment must be dismissed.

Lopinto is also entitled to summary judgment on Plaintiffs' Fourteenth Amendment claim. Lopinto's motion notes that "Plaintiffs do not plead any facts, nor is there any evidence to suggest that the JPSO Defendants were deliberately indifferent to a known and obvious need to train."[198] Plaintiffs do not respond to this argument. As discussed above, to maintain the failure to train claim, Plaintiffs must show "(1) that the municipality's training procedures were inadequate, (2) that the municipality was deliberately indifferent in adopting its training policy, and (3) that the inadequate training policy directly caused the violations in question."[199] Plaintiffs offer no

---

[195] *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 170 (5th Cir. 2010).

[196] *Hare v. City of Corinth*, 74 F.3d 633, 639 (5th Cir. 1996).

[197] *Id.*

[198] Rec. Doc. 52–1 at 23.

[199] *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 170 (5th Cir. 2010).

evidence to support any of these elements.[200]  Therefore, Lopinto is entitled to summary judgment on Plaintiffs' failure to train claim.

### V. Conclusion

Based on the foregoing,

**IT IS HEREBY ORDERED** that Lopinto's Motion for Summary is **GRANTED IN PART** and **DENIED IN PART**. The motion is granted to the extent that it seeks dismissal of Plaintiffs' failure to train claim, and any claim under the Eighth Amendment. The motion is denied in all other respects.

**NEW ORLEANS, LOUISIANA,** this  8th day of March, 2022.

**NANNETTE JOLIVETTE BROWN**
**CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**

---

[200] Rather, it appears that Plaintiffs have abandoned this claim as to Defendant Lopinto. Although Plaintiffs address the failure to train claim in opposition to Defendant CHJ and Ironshore's motion for summary judgment, they have not addressed it in opposition to the instant motion. Rec. Doc. 90 at 6.